## BARKER et al. v. HAZEL–FAIN OIL CO. et al.   (No. 9334.)

(Court of Civil Appeals of Texas. Ft. Worth. Jan. 10, 1920. On Motion for Rehearing, March 13, 1920. Dissenting Opinion March 13, 1920.)

1. RELIGIOUS SOCIETIES ☞18—DEED OF LAND FOR CEMETERY TO CHURCH TRUSTEES DID NOT LIMIT TITLE BUT MERELY USE.

Where the owners of land deeded it to trustees of a church for a public cemetery, to have and to hold to themselves, successors, heirs and assigns forever, the deed vested in the church fee-simple title to the land, and the parenthetical expression in the grant that it was for a cemetery was merely limitation of the use to which the land was to be put, and not a limitation of the title, so that it could not be said that under no circumstance did the trustees or church have power to sell.

2. RELIGIOUS SOCIETIES ☞18 — DEDICATION OF LAND FOR CEMETERY DID NOT DESTROY POWER OF CHURCH TO SELL.

The dedication as a place of sepulcher of land deeded to church trustees did not entirely destroy the power of the church or its trustees to sell, which power was merely restricted or held in abeyance until the happening of circumstances rendering it necessary or proper to sell, as abandonment of the cemetery or its condemnation.

3. CEMETERIES ☞20—DEDICATION ☞16(1)— PERSONS HAVING DEAD BURIED IN CEMETERY HELD ENTITLED TO RESTRAIN DRILLING FOR OIL.

Where owners of land deeded to church trustees for a cemetery, and thereafter members of the church and public were interred in the land. there was a dedication to cemetery purposes, and so long as it continued fit for such purposes it was the duty of the church through its trustees to execute the trust and maintain the cemetery for the benefit of the public, and persons having their dead buried therein had the right to invoke the aid of equity to restrain destruction, spoliation, or disturbance of the graves, as by an oil company's drilling a well under conveyance from the trustees.

4. CEMETERIES ☞13 — TRUSTEES WITHOUT RIGHT TO CONVEY CEMETERY LAND FOR STOCK OF OIL COMPANY, NOT MONEY.

Trustees of a church, grantees in a deed of land for cemetery purposes, vested with fee-simple title, and authorized by their governing authority to sell part of the land, had no authority to convey the land to an oil company in consideration of one-eighth of its capital stock instead of money.

### On Motion for Rehearing.

5. CEMETERIES ☞20—RIGHT OF PERSONS ACCEPTING DEDICATION TO PROTECT GRAVES OF DEAD AGAINST DRILLING OF OIL WELL.

Where owners of land deeded it to trustees of a church for cemetery purposes, and the dedication was completed by use of the land as a cemetery, persons having their dead buried

---

(219 S.W.)

therein could protect the graves, not only as against the grantor and trustees of the church, but also as against an oil company holding the deed of the trustees, for which it had paid cash consideration before proceeding to drill an oil well on the land.

6. CEMETERIES ⊜∞14—NO LOSS OF STATUS BECAUSE FURTHER INTERMENTS HAVE CEASED OR BECOME IMPOSSIBLE.

A cemetery does not lose its character as such because further interments in it have ceased or become impossible, but remains subject to the use so long as the bodies remain buried, or until they are moved by public authority, friends, or relatives.

7. CEMETERIES ⊜∞14 — SPRAYING FROM ADJACENT OIL WELLS NOT TERMINATING USE.

The fact that a cemetery is subject to spray of oil from adjacent wells does not necessarily render it unfit for cemetery purposes, and if the spraying is to such an extent as to constitute a nuisance, it is a wrong of which persons having relatives and other dead buried there can doubtless complain, and does not justify an oil company, under conveyance from the trustees of the church holding title to the cemetery, in drilling for oil within its confines.

Buck, J., dissenting.

Appeal from District Court, Eastland County; E. A. Hill, Special Judge.

Suit for injunction by R. E. Barker and others against the Hazel-Fain Oil Company and others. From judgment for defendants, plaintiffs appeal. Reversed, temporary injunction reinstated, and cause remanded.

Turner & Seaberry, of Eastland, for appellants.

Conner & McRae, of Eastland, and Phillips & Trammell, of Ft. Worth, for appellees.

CONNER, C. J. This is an appeal from an order dissolving a temporary writ of injunction theretofore issued upon an application of appellants.

Appellants alleged, in substance, that by deed of gift, followed by use, the M. E. Church, South, of Pleasant Grove, Eastland county, had dedicated and used as a public cemetery a parcel of land 100 yards square in the northeast corner of the northeast one-fourth of section 3, block 4, of the Houston & Texas Central Railway Company's survey of Eastland county, and that they, appellants, were beneficiaries of the designated use, having the bodies of deceased relatives buried in said cemetery. Appellants further alleged that the defendants, claiming right to so do by virtue of an invalid deed from the trustees of said church, had entered upon said cemetery, and were now threatening to erect derricks, dig slush pits, etc., for the drilling of an oil well which, it was averred, would inevitably result, if allowed to proceed, in discordant noises, obnoxious odors, and desecration of graves by spraying oil, etc., to the damage and distress of the applicants.

The defendants, appellees here, justified under the deed of the trustees of the church referred to in the pleadings of the applicants for the writ, further allege that the part of the cemetery conveyed had become unfit as a burial place, and that the threatened operations complained of could be so carried on as not to disturb or injure existing graves beyond what had already been done by operations and flowing oil wells in the immediate vicinity.

We find in the record no written conclusions of the trial judge, but evidence was heard on the hearing of the motion to vacate the temporary writ, and therefrom, and from the contentions of counsel in the presentation of the case here, we infer that the trial court entertained the view presented by the defendants' answer to the effect that the evidence justified the conclusion that the part of the cemetery conveyed to the appellee the Hazel-Fain Oil Company was no longer suitable as a place for burial; that the deed from the original grantors to the trustees of the church conveyed a fee-simple title, and that hence the deed of the trustees to the appellee oil company conveyed title authorizing the drilling and operation of the threatened oil well, which, the court probably further concluded, would not prejudicially affect graves already situated.

The undisputed facts show that on the 7th day of March, 1906, one B. M. McClesky, joined by his wife, I. E. McClesky, executed and delivered a deed to T. Y. Butler, Allen Morton, and T. J. Cornelius as trustees of the Methodist Episcopal Church, South, of Pleasant Grove to the plat of ground hereinbefore referred to. The deed recites that it was in "consideration of the sum of one dollar to us in hand paid" by the trustee named. The deed further recites that for the consideration stated the grantors "have granted, sold and conveyed and by these presents do grant, sell and convey unto the said trustees and their successors in office for the use and benefit of said church, as a public cemetery," the tract of land mentioned. After description of the land conveyed follows the habendum clause in the following words:.

"To have and to hold above-described premises, together with all and singular the rights and appurtenances thereto in any wise belonging unto the said trustees of said church and their successors and their heirs and assigns forever."

The habendum clause was followed by the following warranty:

"And we do hereby bind ourselves and our heirs, executors and administrators to warrant and forever defend, all and singular, the said premises unto the said trustees and their successors in office and their heirs and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof."

---

⊜∞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

·: The undisputed evidence further shows that after the execution and delivery of the deed above mentioned by the McCleskys . the plat of ground described therein was .accepted, and thereafter used as a burial ground for members of the church and of deceased persons from among the public generally, and that such use continued until the institution of the present proceeding, with the result that something like two-thirds of the eastern part of the cemetery is occupied with graves, among which is the final resting place of the fathers, mothers, and grandfathers of some of the plaintiffs in· this suit;· that upon the ·west one-third of the cemetery deeded to the .oil company, as will be hereinafter shown, ·no burials have taken place, and there is ·testimony to the effect that that part of the cemetery has not been cleared of timber and underbrush, and some of the witnesses testified that it was not suitable as a burial ground. The proof also shows that some four, or five, or six producing :oil wells have been drilled by owners and lessees, not parties to this proceeding, around the cemetery in question, and that as a result of these producing wells the graveyard generally has been sprayed with oil, which has spread over the graves and tombstones, ·except when covered ·with some protecting material.

It was further shown that on the 29th day' of August, 1919, T. Y. Butler, E. Roper, B. F. Dempsey, J. S. Lemond, and B. M. Smith, as trustees of the M. E. Church, South, of Pleasant Grove, executed and delivered to the Hazel-Fain Oil Company a deed to the strip of land in controversy, to wit, the west one-third of the cemetery plat.

[1, 2] We cannot agree with what seems to be appellants' principal contention to the effect that under the deed from the McCleskys to the trustees of the church no sale by the trustees could be made. This deed we think, in effect, vested in the church the fee-simple title to the burial lot free from any right of reversion to the grantors. The parenthetical expression in the grant, "for a cemetery," is a limitation of the use to which the lot was to be put, and not a limitation of the title. This being true, it cannot be said that under no set of circumstances would the church have the power to sell. Such a power is an ordinary incident of a fee-simple title, and inherent in a fee-simple owner, unless restricted by the terms of the grant. The limitation noted in the grant under consideration of the use to which the land was to be put, followed as it was by the burial of numerous deceased members of the church and of the public, it is true amounted to a dedication of the land as a place of sepulcher, but such dedication would not entirely destroy the power to sell. Such power was merely restricted or held in abeyance until the happening of such circumstances as rendered it necessary or proper to sell, as if, for instance,

the cemetery should be wholly abandoned, or suddenly become unfit as a burial place, or be condemned and all bodies removed by Legislature or municipal enactment on the ground of its being a public nuisance. In such cases, the potential power to sell, though long dormant, would arise free from all restrictions, and could be made to assume its active quality by the holder of the legal title: See Olcott v. Gabert, 86 Tex. 121, 23 S. W. 985; Long v. 'Moore, 19 Tex. Civ. App. 363, 48 S. W. 43; McLeod v. McCall, 180 S. W. 293 ; Downen v. Rayburn, 214 Ill. 342, 73 N. E. 364 ;, Andrews v. Sercombe, 82 Or. 616, 162 Pac. 836; 11 Corpus Juris, p. 57, § 18. We therefore conclude that the form of the deed of the McCleskys to the church of itself is not a sufficient reason for disregarding the deed to the appellee oil company.

[3] But we think it must be assumed, without extended discussion or citation of authority, that the deed of the McCleskys, followed as it was by the actual use of the land as a cemetery, amounted to a dedication of the land to that purpose, and that so long as so used, and so long as fitted for the purpose, it was the duty of the church through its trustees to execute the trust and maintain the cemetery for the benefit of the public, and that any person, as plaintiffs, having loved ones buried therein would have the right to complain and to invoke the aid of a court of equity to restrain destruction, or spoliation, or disturbance of the graves. See 11 Corpus Juris, p. 64, § 35; Wormley v. Wormley, 207 Ill. 411, 69 N. E. 865, 3. L. R. A. (N. S.) 481, and notes; Davidson v. Reed, 111 Ill. 167, 53 Am. Rep. 613; 5 R. C. L. 246, § 11, and cases cited in notes 6 and 7.

[4] When, therefore, appellants established by their evidence, as they did, the existence of the trust or charitable use and their beneficial interest therein, they made out a prima facie case, and it then rested upon the defendants· to defeat the prima facie case so made by justifying the threatened intrusion upon the cemetery grounds. This they attempted to do, as already stated, by proof of the deed from the trustees of the church to the defendant oil company. In the absence of such deed, there is no pretense that the defendants have any right whatever to invade and commit trespasses as they are asserting the right to do. In our judgment, and for a reason not assigned in the briefs, the deed affords no justification for the threatened acts. The deed on its face recites that it was executed in consideration of $20,000 in "stock" of the Hazel-Fain Oil Company, and the proof shows that no other consideration was received.

The presiding elder of the district testified without dispute that—

"All property in our church, in a pastorial charge, is under the absolute control of the quarterly conference, and they can sell or dis-

pose of it as they see proper. Without the action of the conference, the trustees have not the authority to sell the property. * * * They [the trustees] have no authority whatever, any more than any other member of the church, than that authority which is given by the board of conference. It becomes necessary for the trustees to execute conveyances, upon the instructions of the quarterly conference. They have no choice in the matter."

This witness further testified that, having been solicited to do so, he called a quarterly conference of the Pleasant Grove Church, at which seven of the trustees were present, and that five of them signed the conveyance under consideration to the oil company. He further testified that minutes of the quarterly conference mentioned were taken, and from those minutes we copy the following, having relevancy to the matter under discussion:

"Resolved that the board of trustees be instructed to sell 36⅔ yards off the west of the block of land described as follows: Beginning at the N. E. corner of the N. E. ¼ of section No. 3 in block No. 4 H. & T. C. Ry. Co. lands in Eastland Co., Texas, certificate No. 26/.1537. The same being the southeast corner of survey No. 4 from which a P. O. marked R. R. bears N. 18 E. 12 vrs. do. 8 inches marked H. C. brs. N. 25 E. 9 vrs. Thence west 100 yards; thence south 100 yards; thence east 100 yards; thence north 100 yards to the beginning. Containing 100x100 yards square of land out of the N. E. corner of the quarter section of land above described.

"The above motion was voted upon and carried unanimously.

"The following motion was made and seconded:

"Be it resolved that the whole proceeds of the above described property be used entirely for the benefit of and the beautifying of the cemetery connected thereto."

R. C. Fain, among other things, testified that:

"The capital stock of the Hazel-Fain Oil Company is $160,000, making the $20,000. we are giving the church equal to one-eighth of the production, and the trustees are getting the one-eighth if there is any production."

He further testified:

"I have not sold any stock at all. It is immaterial whether I sell any or not. I own all the stock except the church stock of $20,000. * * * This deed from these trustees is all the assets this company has at the present—we have other deals under investigation. I plan to buy other property, possibly, whenever I can find something good."

He further testified that he had given to Mr. McClesky, (who signed the original deed to the church) $10,000 in stock, and that he was going to give $10,000 in stock to the presiding elder who had called the conference, but that nothing had been said about giving Mr. Roper (one of the trustees) any of the stock.

Conceding that circumstances might exist that would authorize a sale by the trustees of the church of the strip of land in question off the west side of the cemetery, we do not think the facts above mentioned authorized the sale in question. In 1 Mechem on Agency, § 895, it is said:

"Mere authority to sell gives an agent no authority to exchange the chattels for other property, or to take anything else than money in payment for them, though such an authority may, of course, be conferred expressly or be fairly inferred from the language of the power. Such an agent cannot therefore take payments in notes, checks, or other paper."

Numerous authorities are cited in the notes in support of the text. So, in 2 Corpus Juris, p. 599, § 234, in discussing the powers of an agent, it is said:

"As a general rule, the sale must be for cash only, and, in the absence of special authority, mere authority to sell does not give the agent authority to sell on credit, and such an agent cannot bind his principal by receiving payment in bonds, notes, or other paper. * * *

"A sale contemplates a price in money, and hence authority to sell confers power to sell for cash, but not to exchange for other property, or for part property and part cash, unless the terms of the agency clearly empower him to exchange; and the fact that the agent can make the sale only by accepting goods in payment does not authorize him to make the sale on such terms."

To the same effect is the case of Fitzhugh v. Franco-Texas Land Co., 81 Tex. 306, 16 S. W. 1078. In that case the president of the land company, one Duke, undertook to convey 33 sections of land owned by his company to others. One of the notes given by the purchaser as part of the purchase money was made "collectable" in horses of a certain brand at $30 per head. In discussing the validity of the conveyance, the Supreme Court said:

"The corporation was organized for the purpose of acquiring lands and for selling and conveying the same. It can hardly be held that the power to sell and convey carries with it a power to exchange them for personal property, and certainly not when, as in this case, the charter does not empower the corporation to acquire and hold such property for mere purposes of trade. Is it to be implied then from the facts in evidence in this case that any such authority was intended to be conferred upon Duke? A power to sell conferred by a natural person does not authorize the agent to barter the property. Reese v. Medlock, 27 Tex. 120 [84 Am. Dec. 611]; Trudo v. Anderson, 10 Mich. 357, 81 Am. Dec. 795; Organ Co. v. Starkey, 59 N. H. 142; Lumpkin v. Wilson, 5 Heisk. [Tenn.] 555; Mfg. Co. v. Givan, 65 Mo. 89; Victor, etc., Co. v. Huler, 44 Wis. 265; Rogers v. Bass, 46 Tex. 505. It follows, then, that an agent who was authorized merely to sell upon a credit could not take for a deferred payment a written promise which the promisor had the election to discharge in anything but money. No express authority being shown for Duke

to make this particular transaction, and no circumstances appearing from which such authority can be implied, it is clear that the conveyance was without authority, and subject to be canceled, as against all persons claiming under it. The rule is well settled that all persons dealing with a corporation must take notice of the powers conferred upon it by its charter, and that its agents cannot exercise any authority in excess of these powers."

Under the foregoing authorities, it seems certainly clear that the trustees of the Pleasant Grove Church, as such, had no authority to accept in payment for the conveyance of the west one-third of the cemetery in question stock in the Hazel-Fain Oil Company, nor can any such authority be derived from the order of the conference which we have quoted. The resolution adopted by the quarterly conference was that the "board of trustees be instructed to sell 36⅔ yards off of the west of the block of land described as follows," etc. The resolution, of course, is the best evidence of the action of the conference, and nothing is to be found in the resolution authorizing an exchange of the land conveyed for stock or other property. Surely, neither the Pleasant Grove Church, the beneficiary under the McClesky deed, nor members of the public interested in the maintenance of the cemetery, can be held bound by the deed the trustees in fact executed and delivered to the Hazel-Fain Oil Company. As seen from the evidence quoted, the total assets of the oil company and the sole basis of value, so far as the record shows, was the land conveyed by the trustees, and for which the church received but one-eighth of the capitalization. In other words, the transaction, if sustained, amounts to the church furnishing all of the assets and giving seven-eighths thereof to R. C. Fain, the promoter. There is no evidence showing whether R. C. Fain was financially responsible, or that the stock of the oil company had a market value, nor is anything in the record shown giving the Pleasant Grove Church authority to become a stockholder in an oil company and thereby become a member of an oil development association. In brief, and pretermitting a discussion of several other questions presented in the record, we are of the opinion that the deed of the trustees to the oil company was wholly unauthorized and invalid, and that it affords no basis justifying the oil company to enter upon or otherwise disturb in the manner alleged the rightful possession of the M. E. Church, South, of Pleasant Grove, or of the appellants in this case.

It is accordingly ordered that the judgment below be reversed, the temporary injunction originally issued be reinstated, and the cause remanded.

### On Motion for Rehearing.

Appellees are insistent in urging that appellants are not in a position to question the validity of the deed under which they are asserting the right to invade the cemetery in question. We are unable to see how this can be successfully maintained. Such rights are abundantly sustained by the authorities cited in our original opinion on this point. For instance, in 11 Corpus Juris, p. 64, § 35, it is said:

"Equity has jurisdiction to enjoin an unwarrantable disturbance or interference with a burial ground or the graves therein."

The text thus quoted, in a note, is supported by decisions from many states. On the following page, section 47, it is also said, among other things:

"A court of equity will enjoin interference with graves on land dedicated to the public for burial purposes at the suit of the proprietor of a cemetery, or of any part having deceased relatives or friends buried therein."

In 5 R. C. L. p. 248, § 13, it is said:

"A court of equity is recognized as the proper tribunal to resort to in order to protect the rights of those owning lots in, or having relatives buried in, a cemetery. Thus it has been held that a person who has near relatives buried in a public cemetery has a peculiar right in the maintenance of the cemetery as a public use, and may maintain an action for an injunction to prevent the obstruction of such public use. It is also well settled that a court of equity will enjoin the owner of land from defacing or meddling with graves on land dedicated to the public for burial purposes, at the suit of any party having deceased relatives or friends buried therein."

A number of cases are cited in a note to the text, and among others is an interesting one by the Supreme Court of Missouri. The case is that of Tracy v. Bittle, 213 Mo. 302, 112 S. W. 45, 15 Ann. Cas. 167. In that case, the owner of a farm in 1860 staked off about a half acre adjoining a public road for a burying ground. No deed was made, however, to the lot, but members of the public were buried therein, and the plat was recognized as a burial lot by the owner. The plaintiff in the action, which was, as here, for injunctive relief, sued the then owner to prevent interference with the plaintiff in an effort to replace fences around it. The facts showed that members of the public indiscriminately, who desired to do so, used the graveyard, and as many as 18 or 20 graves were located in the lot, burials continuing until some time about 1878, when, upon the establishment of a new graveyard, no more burials took place in the lot. There was evidence tending to show that the graveyard had been fenced, but that the inclosure, with other lands, had been used by the defendant Tracy as a pasture for more than 10 years. It was held that the circumstances showed an original dedication by the owner of the lot as a burial ground. It was also held that the plaintiff's action was not barred by limitation

under a Missouri statute, and that the plaintiff, having near relatives buried in the graveyard, had a peculiar right in the maintenance of the public use to which it had been originally dedicated, and in preventing an obstruction to this public use. It was said:

"That citizens having an interest in the maintenance of a public use can maintain a suit to enforce their rights is fully recognized in the recent case of State ex rel. Titus v. Wabash Ry. Co., 206 Mo. 258, 103 S. W. 1137, and cases cited."

It was further held that there had been no abandonment of the land, and that it was still a public graveyard, inclosed and known and recognized as such, and, quoting with approval from the case of Hunter v. Trustees of Sandy Hill, 6 Hill (N. Y.) 414, that:

"When these graves shall have worn away, when they who now weep over them shall have found kindred resting places for themselves, when nothing shall remain to distinguish this spot from the common earth around, and it shall be wholly unknown as a graveyard, it may be that some one who can establish a good 'paper title' will have a right to its possession; for it will then have lost its identity as a burial ground, and with that all right founded on the dedication must necessarily become extinct."

The court further quoted with approval the following from the case of Kansas City v. Scarritt, 169 Mo. 484, 69 S. W. 286:

"A cemetery is none the less a graveyard because further interments in it become impossible. It only loses its character as a resting place of the dead when those already interred are exhumed and removed."

The court, therefore, in the case of Tracy v. Bittle, supra, held, as we have stated, that the graveyard had not been abandoned so as to give the defendant the right to the use of the land, using the following language in disposing of that point:

"It is true that for some years no new interments have been made, but it is still the resting place of the dead. To this plaintiff and others sacred memories are awakened in viewing the spot. They cluster around the little half worn mounds there. It is true that for some years this ground has not been kept in a condition commensurate with these memories. The vicissitudes of life sometimes may have been such as for awhile to make them forget these sacred memories, but such forgetfulness does not authorize the desecration of the graves of their loved ones by strange hands. They have a right to return to the spot, and, as it were, bury their forgetfulness, and do homage to their sacred memories, by placing these resting places in proper and appropriate condition, and if there is a public burying ground, as in this case, no stranger hand can forbid them. Under the facts and the law this graveyard has not as yet been abandoned."

[5] In the case of Beatty v. Kurtz et al., Trustees of a German Lutheran Church of Georgetown, by the Supreme Court of the United States, to be found in 2 Pet. 566, 7 L. Ed. 521, it appeared that a lot of ground had, in the original plan of an addition to Georgetown, been marked for the Lutheran Church, and by the German Lutherans of the place had been used as a place of burial from the dedication. It appeared that the German Lutherans were not an incorporated body, nor were there any persons who as trustees could hold the property. It was held, however, that there had been a dedication, and that the heirs of the donor could not disturb the Lutherans in their possession of the lot. The right of plaintiffs in that suit to maintain the action was also disputed, but the court held that whether the plaintiffs had been specially authorized to or not was immaterial, for the reason that the court thought the case "one of those cases in which certain persons belonging to a voluntary society, and having a common interest, may sue in behalf of themselves, and others having the like interest as part of the same society for purposes common to all and beneficial to all." Abundant additional authority, we think, might be cited on the point now under consideration, but we feel that we have sufficiently elaborated the conclusion stated by us in our original opinion that the plaintiffs in this suit were entitled to maintain the action, and in this connection we might further add that the authorities from which we have quoted and others that might be cited appear to make it immaterial in this case whether a threatened trespass on or injury to a graveyard is by one in whom the legal title rests or by another. In other words, if it be assumed that the deed of the trustees of the Pleasant Grove Church had been for a cash consideration instead of an unauthorized one, nevertheless the plaintiffs in the present action would be entitled to complain. They have, as we think, a right to protect the graves of their dead, not only as against the original donor and the trustees of the Pleasant Grove Church, but also as against all persons so long as the graveyard maintains its lawful existence. If the McCleskys, the original grantors in the deed of dedication, could not disturb the plaintiffs in this action, how then can it be said that the trustees, appointed by them to carry out the charitable use to which they had dedicated the land, now do so? We do not think, upon the allegations and facts appearing, that it can be done. We are of the opinion that neither the appellee oil company, acting alone or together with the trustees, can, by deed or otherwise, upon any inducement or consideration appearing in the record, deprive appellants from the protection to which they are entitled. Man in every time and clime has been inclined to stoutly defend the burial ground of their dead, and it would be strange indeed if in this day they are without a peaceful remedy.

[6] It is further insisted with much earnestness that the cemetery is no longer fit for the purpose for which the ground had been dedicated. In addition to what appears in quotations above, we cite the following from 11 Corpus Juris, p. 58, § 20:

"A cemetery does not lose its character as such because further interment in it has ceased or become impossible. Where premises have been dedicated as a graveyard, they remain subject to that use so long as bodies remain buried there, and until they are removed by public authority, or by friends or relatives."

[7] And add that some of the witnesses expressed the opinion that the cemetery under consideration is no longer fit for the purpose, such statements are evidently mere conclusions; no fact or circumstance being stated to support the conclusion, except that adjoining wells had sprayed the graves with oil. The length of time since this occurred, however, is not shown, nor is it shown that such adjoining wells continue to spray oil. If they do to such an extent as to constitute a nuisance, it would amount to a wrong of which appellants could doubtless complain, and the fact that one or more other parties have or are continuing to commit a wrongful act will not alone justify the appellees in doing the same thing.

The evidence of T. Y. Butler, one of the trustees, has been cited as showing that the cemetery was no longer fit for use. He also testified to the effect that he finally signed the deed to the Hazel-Fain Oil Company under the urgency of the presiding elder, and that there had been a gate in the west side of the cemetery out of which they could leave the cemetery grounds until the erection of a board fence some 8 feet high along the east line of that part of the cemetery claimed by the oil company. He further testified:

"It is not altogether a matter of sentimentality with me, relative to the drilling of a well on that strip of land. Of course I feel more affectionate than one would that didn't have anybody buried there, when my companion is buried there. It is the feeling I have for the dead of the community, and for my family, and those who wish to bury there. That place is now really unfit for a cemetery, but the dead there now are there, and we can't help it. The oil has already bespattered the whole business—all over it. The cemetery is not ruined by the oil that is already on it, but it is badly injured. If there was a more suitable location where they were not drilling an oil well, I would prefer to bury my dead in that new cemetery. But if I were to die to-night, I would want to be buried there by my wife, irrespective of how bad it is, and I think everybody else that has people buried there is of the same sentiment. I have never seen them disinter the dead. It would be more suitable if there was a cemetery out there in that community, where there were no oil wells, to disinter the dead and put them in a new cemetery, but I would be opposed to it."

The above testimony of Butler is quoted to illustrate our conviction that the injuries complained of by appellants extend, not only to the 6×4 feet occupied by their dead relatives, but also to the cemetery as a whole. At best, it is but small, and is occupied by graves, according to the testimony, within 12 feet of the board fence erected by the oil company. Not only have the dead a right to be undisturbed, but the living may properly entertain the hope that they too shall have room to lie in the immediate vicinity of the bodies of those whom they love.

We think the motions should be overruled, and it is so ordered.

BUCK, J. (dissenting). I agree with much that has been said, in the original opinion, but, upon further consideration of this case, I have reached the conclusion that appellants are not in a position to question the validity of the deed given by the trustees of Pleasant Grove Church upon the ground that said trustees sold the land for $20,000 in stock of the Hazel-Fain Oil Company, when according to the minutes of the conference they were only authorized to sell for cash or moneyed consideration.

The court was amply sustained by the evidence in his presumable conclusion that the drilling of several other wells near to this lot had already ruined it, at least temporarily for cemetery purposes. R. C. Fain testified: That the Albers well was as close to the cemetery fence as a derrick could be built, about 3 or 4 feet. This is a producing well. Just across the section line, running north and south, is Ballentine's two producing wells. Right across from the Albers well is the Leon Oil Company's producing well. Approximately 10 feet of the west line of the cemetery is another producing well. Just across from the last-named well, north, is the Root, Hupp & Duff well. Other wells are in the near vicinity of the lot in controversy. That the tombstones were in the same condition, as to being sprayed with oil before the Hazel-Fain deed was made as they were at the date of the trial. He further testified, without contradiction:

"I think I know of one or two marble stones that are not covered. All of the others are covered with oil cloth or boxes made for them. All of that cemetery is saturated with oil. I don't think you could take a spray and go there and grease it any worse."

There was other evidence in the statement of facts to the effect that the lot has become unfit for a cemetery. T. Y. Butler, witness for appellants, testified, in regard to the condition of the cemetery:

"That place is now really unfit for a cemetery, but the dead there now are there, and we can't help it. The oil has already bespattered the whole business, all over it. The cemetery is not ruined by the oil that is already

on it, but it is badly injured. If there was a more suitable location where they were not drilling an oil well, I would prefer to bury my dead in that new cemetery, if I didn't already have any buried in the old cemetery."

It is further in evidence: That an 8-foot board fence separates the 110 feet sold to the Hazel-Fain Oil Company from the rest of the cemetery lot, and Mr. Fain testified that there would not be more waste from the oil when it is first discovered, except to open the well to get the bit in and out. That if he was permitted to drill on this strip, and should discover oil, there would be little probability of oil spraying on those tombstones. There might be some little oil blown by the wind, but it could not grease anything worse than it is already greased. That if he were permitted to drill, and was requested so to do, he would cover any tombstone in the cemetery which was not covered at that time.

This evidence supports the conclusion that must be imputed to the trial court that no further damage to the cemetery lot and tombstones and graves therein would result from permitting this well to be drilled, and that various other wells in the vicinity of the cemetery had already ruined the lot for cemetery purposes.

If the evidence is sufficient to support that conclusion by the trial judge, then plaintiff's grounds for injunction would fail. They are not concerned, nor does their pleadings raise the issue about whether the trustees were authorized under the action of the quarterly conference in selling the land for stock in the Hazel-Fain Oil Company. This is a collateral attack, at most, upon that transaction and the deed that was passed as a result of the decision reached at the quarterly conference. The plaintiffs were not privies to or interested in that transaction, and were not in a position to question the validity of the deed. Since the disposition of the case in our former opinion is based upon the presumption that plaintiffs below would have the right to question the validity of the deed, it follows that our former judgment was erroneous. Therefore, in the opinion of the writer, the judgment of the trial court should have been in all things affirmed.