STATE, RESPONDENT, *v.* GATEWAY MORTUARIES, INC., ET AL., APPELLANTS.

(No. 6,581.)

(Submitted March 4, 1930. Decided March 31, 1930.)

[287 Pac. 156.]

Mr. *Carl J. Christian*, for Appellants, submitted a brief, as did *Messrs. Wuerthner & Murch* and *Mr. Harry H. Parsons*, of Counsel; *Mr. Julius J. Wuerthner* and *Mr. Parsons* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. L. V. Ketter,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Ketter* argued the cause orally.

*Mr. Henry C. Smith* and *Mr. Edmond G. Toomey, Amici Curiae,* submitted a brief and argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

The Gateway Mortuaries, Incorporated, a Montana corporation, and Pat R. Gagner, its agent, have appealed from a judgment of conviction on a charge of violating the provisions of Chapter 88 of the Laws of 1929. The first section of Chapter 88, hereafter referred to as the Act, reads as follows:

"All written contracts or agreements hereafter made for the performance of personal services in connection with the preparation for burial or cremation, or the burial or cremation, of dead human bodies, made prior to the death of the persons whose bodies are to be buried or cremated, when said written contract or agreement is not made in contemplation of the imminent death of said persons, are hereby declared to be against the public policy of the State of Montana and to be unlawful and void."

Section 2 provides that the term "personal services" shall be held to include the embalming, or other preservation of dead human bodies, the cremation of the same, furnishing caskets, burial vaults, providing means of transportation to be used in connection with burials, or any other services in connection therewith that are usually performed by undertakers, and contains the proviso that the independent sale of caskets or burial vaults when not made in connection with a contract covering other services above mentioned shall not be held to be within the term "personal services."

Section 3 provides that one violating the provisions of the Act shall be guilty of a misdemeanor, and upon conviction,

shall be punished for each offense by a fine of not to exceed $1,000, or by imprisonment in the county jail for not more than one year, or both.

After the Act became effective, defendants induced M. G. O'Malley of Butte to enter into a written contract for the burial of himself, his wife and his father-in-law, George Dimnent, the death of no one of whom was imminent, the consideration for the contract being the sum of $45 paid by O'Malley, and the future burial of each of the persons named, on the basis of ''cost-plus ten per cent'' for material furnished, and ''a reasonable allowance for personal services rendered,'' use of hearse and autos ''together with estimated proportionate part of legitimate business and overhead expenses of the company.'' Although, at the time the contract was executed, he was apparently in good health, two weeks thereafter Dimnent died. He was buried by the company pursuant to the contract. Prosecution followed, with the result indicated above.

As counsel agree, a perfect case is presented for testing the validity of the Act. Counsel for defendants argue that the Act is obnoxious to the Fifth and Fourteenth Amendments and section 27 of Article III of our state Constitution, which declare that no person shall be deprived of life, liberty or property without due process of law, and that provision of the Fourteenth Amendment which guarantees the equal protection of the laws, and of section 3 of Article III of the state Constitution which provides that ''all persons are born equally free, and have certain natural, essential, and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties, of acquiring, possessing, and protecting property, and of seeking and obtaining their safety and happiness in all lawful ways.''

Essentially the main question is whether the legislative assembly in prohibiting the contracts described in the Act, and declaring the public policy of the state with reference thereto, transgressed its constitutional powers. The Act rests upon an

attempt to exercise the police power of the state. Does it bear a real and substantial relation to the public health, safety, morals or some other phase of the general welfare? (*Liggett Co.* v. *Baldridge,* 278 U. S. 105, 73 L. Ed. 204, 49 Sup. Ct. Rep. 57.)

Public policy is that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. (Page on Contracts, Supp., sec. 672; *Lawson* v. *Cobban,* 38 Mont. 138, 99 Pac. 128; *Spaulding* v. *Maillet,* 57 Mont. 318, 188 Pac. 377.)

What is the public policy of a state, and what is contrary to it, is not to be measured by the private convictions or notions of the persons who happen to be exercising judicial functions, but by reference to the enactments of the law-making power, and, in the absence of them, to the decisions of the courts. When, however, the legislature has spoken upon a particular subject and within the limits of its constitutional powers, its utterance is the public policy of the state. (Mr. Chief Justice Brantly in *MacGinniss* v. *Boston & Mont. C. C. & S. M. Co.,* 29 Mont. 428, 75 Pac. 89, and *Parchen* v. *Chessman,* 49 Mont. 326, Ann. Cas. 1916A, 681, 142 Pac. 631, 146 Pac. 469.)

An Act of the legislature is presumed to be valid; every intendment is in favor of upholding its constitutionality; it will not be condemned unless its invalidity is shown beyond a reasonable doubt; but when it appears that an Act manifestly violates a constitutional guaranty, the court will not hesitate to pronounce the Act void. (*Gas Products Co.* v. *Rankin,* 63 Mont. 372, 207 Pac. 993; *Hale* v. *County Treasurer,* 82 Mont. 98, 265 Pac. 6.)

Unless there is a clear and palpable abuse of power a court will not substitute its judgment for legislative discretion. Local authorities are presumed to be familiar with local conditions and to know the needs of the community. (*Allion* v.

*City of Toledo*, 99 Ohio St. 416, 6 A. L. R. 426, and exhaustive note, 124 N. E. 237.)

The right to contract is vouchsafed to every citizen by the law of the land, if the subject of the contract is a lawful one, the persons making the same are competent to make it, and the exercise of the right does no injury to the public. (*Pittsburg, C., C. & St. L. Ry. Co.* v. *Carmody*, 188 Ky. 588, 12 A. L. R. 469, 222 S. W. 1070; 12 C. J. 949.)

The right of private contract is no small part of the liberty of the citizen, as Mr. Justice Shiras said in *Baltimore & O. S. W. R. Co.* v. *Voigt*, 176 U. S. 498, 44 L. Ed. 560, 20 Sup. Ct. Rep. 385, 387, in which the learned Justice quoted the language of Sir George Jessel, M. R., in *Printing etc. Co.* v. *Sampson*, L. R. 19 Eq. 465: "It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider,—that you are not lightly to interfere with this freedom of contract."

Said Mr. Justice Pitney in *Coppage* v. *Kansas*, 236 U. S. 1, L. R. A. 1915C, 960, 59 L. Ed. 441, 35 Sup. Ct. Rep. 240, 243: "Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no

other honest way to begin to acquire property, save by working for money."

The supreme court of Tennessee in *Moyers* v. *City of Memphis*, 135 Tenn. 263, Ann. Cas. 1918C, 854, 186 S. W. 105, 112, declared: "The liberty of contract is one of the inalienable rights of a citizen. The right to pursue a lawful calling embraces the right to enter into all contracts proper, necessary, and essential to the carrying out of the purpose of such calling. * * * "

In *Allgeyer* v. *Louisiana*, 165 U. S. 578, 41 L. Ed. 832, 17 Sup. Ct. Rep. 427, the supreme court said that the "liberty," mentioned in the Fourteenth Amendment, includes the right to enter into all contracts which may be proper, necessary and essential in carrying out to a successful conclusion a lawful calling. (And see *Chas. Wolff Packing Co.* v. *Court of Industrial Relations of Kansas*, 262 U. S. 522, 27 A. L. R. 1280, 67 L. Ed. 1103, 43 Sup. Ct. Rep. 630; *People* v. *Holder*, 53 Cal. App. 45, 199 Pac. 832; *Hyatt* v. *Blackwell Lumber Co.*, 31 Idaho, 452, 1 A. L. R. 1663, 173 Pac. 1083; *Hall* v. *State*, 100 Neb. 84, L. R. A. 1916F, 136, 158 N. W. 362; *Minnesota Wheat Growers' Assn.* v. *Radke*, 163 Minn. 403, 204 N. W. 314; *People* v. *Chicago, Mil. & St. P. R. R. Co.*, 306 Ill. 486, 28 A. L. R. 610, 138 N. E. 155.)

Nevertheless, the right to contract under any and all circumstances is not absolute. (*Adkins* v. *Children's Hospital*, 261 U. S. 525, 24 A. L. R. 1238, 67 L. Ed. 785, 43 Sup. Ct. Rep. 394.) "While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts * * * and, indeed, may restrain all engaged in any employment from any contract in the course of that employment, which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every

citizen has a right freely to contract for the price of his labor, services or property." (*Frisbie* v. *United States*, 157 U. S. 160, 39 L. Ed. 657, 15 Sup. Ct. Rep. 586, 588.)

Doubtless, Mr. Freund had in mind the law thus correctly stated, when he said: "But the liberty of contract, like all other civil liberty, is subject to restraint and regulation on behalf of the public welfare, and to speak of a constitutional liberty of contract without careful qualification is a vague and meaningless phrase. The liberty of contract yields readily to any of the acknowledged purposes of the police power, and it differs from fundamental constitutional rights, from the liberty of the body or person, from the rights of property (including the obligation of existing contracts), from the right of equality, and from political liberty, in that it is neither a vested right, nor right of definite content, nor a right protected by special constitutional guaranties." (Freund on Police Power, sec. 499.) In other words, the right to contract is subject to restrictions placed upon it in the proper exercise of the police power of the state in the interest of the general welfare. (12 C. J. 949.)

"While no court or text-writer has assumed to define with accuracy the limits of the power, it may be said generally that the state may regulate or control every act or thing within its jurisdiction which tends to subvert the government, to injure the public, to destroy the morals of the people, or to disturb the peace and good order of society." (*Herlihy* v. *Donohue*, 52 Mont. 601, Ann. Cas. 1917C, 29, L. R. A. 1917B, 702, 161 Pac. 164, 166.)

The power, to exert what are known as the police powers of the state, belongs to the legislative branch of the government and it rests with that department, primarily, to determine "what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety," as Mr. Justice Harlan said in *Mugler* v. *Kansas*, 123 U. S. 623, 31 L. Ed. 205, 8 Sup. Ct. Rep. 273, 297, but he continued, "It does not at all follow that every statute enacted ostensibly for

the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute (*Sinking Fund Cases,* 99 U. S. 700, 718 [25 L. Ed. 496]), the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed." (*Marbury* v. *Madison,* 1 Cranch, 137, 2 L. Ed. 60.)

The police power of the state extends only to such measures as are reasonable, and the general rule is that all police regulations must be reasonable under all circumstances. (6 R. C. L. 236. And see *Bettey* v. *City of Sidney,* 79 Mont. 314, 56 A. L. R. 872, 257 Pac. 1007.) "This doctrine is being more and more emphasized as the number of police regulations multiply, evincing a tendency to fence in individual freedom as to matters not formerly so narrowed by legislative enactments. The writers declare that the supervision which courts widely exercise regarding the adjustment of means to ends in the protection of public interests as to ordinances extends to legislative enactments as to health and safety. (Freund, Police Powers, sec. 142.)" (*State* v. *Redmon,* 134 Wis. 89, 114 N. W. 137, 143.)

Reasonableness is one of the inherent limitations of the power. (*Rideout* v. *Knox,* 148 Mass. 368, 12 Am. St. Rep. 560, 2 L. R. A. 81, 19 N. E. 390.) For, as Mr. Justice Henshaw said in *Ex parte Jentzsch,* 112 Cal. 468, 32 L. R. A. 664, 44 Pac. 803, 804: "While the police power is one whose proper use makes most potently for good, in its undefined scope and inordinate exercise lurks no small danger to the republic; for the difficulty which is experienced in defining its just limits and bounds affords a temptation to the legislature to encroach upon the rights of citizens with experimental laws none the less dangerous because well meant."

Freedom of contract is the general rule and restraints the exception; and the exercise of legislative authority to abridge it can only be justified by the existence of exceptional circumstances. (*Adkins* v. *Children's Hospital*, supra.)

A state may not, under the guise of protecting the public, arbitrarily interfere with private business, or prohibit lawful occupations, or impose unreasonable or unnecessary restrictions upon them. (*Jay Burns Baking Co.* v. *Bryan*, 264 U. S. 504, 32 A. L. R. 661, 68 L. Ed. 813, 44 Sup. Ct. Rep. 412; *Liggett Co.* v. *Baldridge*, supra; *Meyer* v. *Nebraska*, 262 U. S. 390, 29 A. L. R. 1446, 67 L. Ed. 1042, 43 Sup. Ct. Rep. 625; and see *Weaver* v. *Palmer Bros. Co.*, 270 U. S. 402, 70 L. Ed. 654, 46 Sup. Ct. Rep. 320, in which *Powell* v. *Pennsylvania*, 127 U. S. 678, 32 L. Ed. 253, 8 Sup. Ct. Rep. 992, is distinguished and explained.)

That the business is a proper subject of regulation to safeguard the public interest all concede; no citation of authority is required.

After this somewhat extended review of the law we come to the inquiry whether the Act in question is a reasonable one, designed to serve the public welfare, or whether it is an unreasonable and arbitrary invasion upon the constitutional rights of the citizen.

The business of disposing of the remains of the dead is a useful, essential and lawful one. It is as old as written history and will not perish until civilization ceases to exist. The Act prohibits written contracts for personal services in connection with the burial of a human body when the written contract is not made in contemplation of the imminent death of the person to be buried. Such a contract is denounced as contrary to public policy and void.

"Imminent" is defined to be: "Threatening to happen at once, as some calamity; dangerous and close at hand; impending, as imminent peril. Imminent from the Latin, with a sense of projecting over, signifies liable to happen at once, as some calamity. Impending, also from the Latin, with the sense of

hanging over, is closely akin to imminent but somewhat less emphatic. Imminent is more immediate, impending more remote, threatening more contingent. An impending evil is almost sure to happen at some uncertain time; an imminent peril is one liable to befall very speedily; a threatening peril may be near or remote, but always with hope that it may be averted.'' (Funk & Wagnalls' New Standard Dictionary.)

The effect of this statute may be illustrated by the following examples:

(1) A, a prosperous merchant in a Montana city, is advised by his physician that his, A's, health is in a precarious condition, and he should go upon a protracted ocean voyage at once. A determines to do so. A has been caring for B, an invalid, indigent cousin, who, while not in imminent danger of death, may pass away in A's absence. A seeks out C, an undertaker, and enters into a written contract with him to the effect that if B shall pass away within three months C, for a specified sum of money, will furnish a casket, the necessary transportation, and perform all necessary services in connection with B's funeral. Under the terms of the Act the contract is void and C is guilty of a crime. And it is not certain, under the Act, that A is not guilty also.

(2) D, a man in moderate circumstances, is afflicted with cancer and is advised by his physician that while his death is not imminent, it may occur at any time within six months and beyond doubt will occur within one year. D knows that his wife, who is devotedly attached to him, unless the matter is taken in hand by D himself, will spend a much greater sum of money upon his funeral than D's estate will warrant, and thereby his wife and children will be deprived of money of which they will be in sore need. D enters into a written contract with E, an undertaker, that E will furnish a designated casket and all necessary services incident to the funeral for a certain sum of money. Same result as in example (1).

On the other hand:

(3) X, whose circumstances are similar to D's, following a heavy dinner, is seized with a frightful paroxysm. His physician tells him the malady is *angina pectoris,* and his death is imminent, and it appears to be imminent. X immediately enters into a contract with Y, similar to the one D entered into with E, but X, under the skillful treatment of his physician recovers from the present attack and lives two years. The contract is good.

These examples demonstrate conclusively, it seems to us, the unreasonable and arbitrary character of the Act. The Act prohibits a man, sound in mind and body, from making a written contract for the protection of his estate—*ergo,* for the protection of his wife and children. For all practical purposes, if declared valid, the Act will prevent written contracts respecting its subject matter (save as to that reserved in the proviso) altogether. Can any reason be given why the contracts illustrated in examples (1) and (2) should be prohibited? Example (3) may be deemed fanciful, for none but the exceptional person will think of such a contract under the dread circumstances, but it serves to illustrate the unreasonableness of this legislation.

Any one of the contracts, if oral, is valid under the Act, notwithstanding that the wisdom of the ages has ever favored a written, over an oral contract.

But it is said that the Act is only designed to regulate the business it affects; that the Act is designed to prevent frauds upon the public, and our attention is called to the fact that contracts similar to that entered into between Gateway Mortuaries, Incorporated, and O'Malley have been declared fraudulent and contrary to public policy. The fact that unscrupulous men may enter into fraudulent contracts, respecting a lawful business, is not alone a sufficient ground for the legislature to prohibit lawful contracts respecting that business. "Certainly there is no profession, possibly no business, which does not offer peculiar opportunity for reprehensible practices; and as to every one of them, no doubt,

some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skillfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked." (*Adams* v. *Tanner*, 244 U. S. 590, Ann. Cas. 1917D, 973, L. R. A. 1917F, 1163, 61 L. Ed. 1336, 37 Sup. Ct. Rep. 662, 664.)

"It is not permissible to enact a law which, in effect, spreads an all-inclusive net for the feet of everybody upon the chance that, while the innocent will surely be entangled in its meshes, some wrongdoers also may be caught." (*Tyson & Bro.-United Theatre Ticket Offices* v. *Banton*, 273 U. S. 418, 58 A. L. R. 1236, 71 L. Ed. 718, 47 Sup. Ct. Rep. 426, 432.)

In the exercise of the police power, citizens may, for the public good, be constrained in their conduct with reference to matters in themselves lawful and right. (*City of Butte* v. *Paltrovich*, 30 Mont. 18, 104 Am. St. Rep. 698, 75 Pac. 521.) The argument that "it is only when no state of circumstances could exist to justify the exercise of the police power that the law will be declared void," supposed to be the doctrine of some cases, manifestly is unsound, for abuses may be found in every business; and that doctrine carried to its legitimate conclusion would remove all restraints and permit paternalistic and arbitrary legislation without end, wiping out constitutional guaranties under the guise of an undefined power "outside and in a sense above the Constitution. (*Donnelly* v. *Decker*, 58 Wis. 461, 46 Am. Rep. 637, 17 N. W. 389.)" (*State* v. *Redmon*, supra.)

"Our government was not designed to be paternal in form." (*Ex parte Jentzsch*, supra.) As this court said, in *Gas Products Co.* v. *Rankin*, supra, the paternal theory of government is odious, and we should not treat lightly or disregard the sacred rights recognized and guaranteed by the Constitution. Were we to sustain the constitutionality of this Act,

there would be no limit to which the legislature might not go in depriving persons of the right to contract in a lawful way concerning a lawful business.

No similar Act has been called to our attention, and while some of the cases have gone to a great length in sustaining regulatory legislation, we have not found a case which goes to the extreme called for to sustain this Act. The moving impulse is not to regulate the business; it is to prohibit written contracts relating to the very essentials of the business, except under circumstances practically prohibitive, by reason of human frailty, to the general run of mankind. How the Act reasonably can be said to regulate the business affected is beyond our comprehension.

Having found the Act unreasonable, arbitrary and violative of the provisions of the Constitutions of the United States and of this state, it is our duty to declare it void and we do without hesitation.

The judgment is reversed, with directions to the district Court of Silver Bow county to discharge the defendants, and dismiss the action.

ASSOCIATE JUSTICES GALEN and ANGSTMAN concur.

MR. JUSTICE MATTHEWS, Dissenting: I agree with the general principles of law laid down by the learned Chief Justice, but I cannot agree with his treatment of the case or fact conclusions reached. In my opinion, the majority of the court have brushed aside the fundamental principles governing the consideration of the constitutionality of a statute; have applied the rules applicable to an Act suppressing a lawful business to a mere regulatory statute, and have usurped legislative functions by substituting their individual judgment for that of the legislature.

In addition to the rule announced, that a statute will not be condemned unless its invalidity is shown beyond a reasonable doubt, this court is firmly committed to the rule that it is not

concerned with the wisdom, policy or expediency of a law declared by the legislature, and when an Act is challenged, the inquiry is not whether it can be condemned, but whether it can be upheld. (*State ex rel. Fenner* v. *Keating*, 53 Mont. 371, 163 Pac. 1156; *Wheeler & Motter Merc. Co.* v. *Moon*, 49 Mont. 307, 141 Pac. 665; *State ex rel. Board* v. *District Court*, 62 Mont. 275, 204 Pac. 600.)

These rules should be borne in mind when we come to consider in what manner we may test the validity and reasonableness of a particular Act.

The principles of public policy and the police power of the state were recognized in government long prior to the adoption of our Constitution, and as the constitutional prohibitions against deprivation of life, liberty or property, without due process of law, from which is deduced the constitutional right to contract, are incorporated in the federal and state "Bill of Rights" by which it was not intended to lay down any novel principles of government, but simply to embody in the Constitution certain guaranties and immunities which we inherited from our English ancestors and which had, from time immemorial, been subject to certain well-recognized exceptions, arising from necessity. (6 R. C. L. 246.) It is clear that the framers of the constitutional guaranties intended that they should be subject to these necessary restrictions for the good of the state, and that a law framed in the proper exercise of the police power constitutes "due process of law." (See *State* v. *Redmon*, cited in the majority opinion.)

I take it, as conceded by the majority, that when it is apparent that an evil exists from which the public should be protected, the legislature has power to make reasonable regulatory provisions for its eradication and that the constitutional provisions considered mean no more than that "a state may not, under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them."

(*Jay Burns Baking Co.* v. *Bryan*, 246 U. S. 504, 32 A. L. R. 661, 68 L. Ed. 813, 44 Sup. Ct. Rep. 412, 413.)

The Act under consideration manifestly does not prohibit the lawful and necessary business of undertaking, nor does it, in any manner, interfere with such business as it has been conducted from time immemorial and as other business enterprises are usually conducted; it does not suppress contracts generally used in the conduct of such a business, but merely prohibits one function of such business and one species of contract. If it may be said that suppression can be read into the Act, it can only be said that it suppresses that exotic, parasitical, recent growth upon the business patterned after Octavus Roy Cohen's fictitious and farcical ''Over the River Buryin' Sassiety,'' making a business, not of burying the dead, but of inducing the credulous to enter into contracts for their burial, at that vague and indefinite time, when the ''grim reaper'' shall have, at last, gathered them in.

''By prohibition is understood that legislative policy which renders illegal some entire sphere of action or business, and not merely some particular mode or form of it, or merely its exercise at a particular time or in a particular place, so that it would still be possible to engage in the pursuit by an accommodation to the legal requirements. With reference to any particular subject-matter, therefore, partial prohibition constitutes regulation.'' (Freund on Police Power, 52.)

It seems to me that our question is: Was the legislature faced with a real, not a fanciful, evil to be eradicated, and, if so, was the method adopted so unreasonable as to condemn the Act?

''The question of reasonableness usually resolves itself into this: Is the regulation carried to a point where it becomes prohibition, destruction, or confiscation?'' (Freund on Police Power, 61.)

With the law as we have declared it, commanding us not to declare an Act unconstitutional unless it is shown to be ''beyond a reasonable doubt,'' and that the inquiry is not as

to whether it can be condemned, but whether it can be upheld, I do not believe that we are justified in coursing far afield to discover situations in which the Act may work a hardship on individuals, or to frame contracts which may be free from some of the evils which the legislature sought to prevent.

It seems to me that, as a guide to approach, the pronouncements of the supreme court of the United States should be at least persuasive. In *Munn* v. *Illinois*, 94 U. S. 113, 132, 24 L. Ed. 77, it is said: "For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist. * * * For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, * * * but if it could, we must presume that it did. Of the propriety of legislative interference within the scope of legislative power, the legislature is the exclusive judge." I do not advocate going as far as did the court in that case; it seems to me that such a pronouncement is abdicating the right of the courts to determine the reasonableness of the Act, to a great extent, and that, as the modern trend is more liberal, that court may at some future time modify its declaration. However, declarations almost as strong were made in *Otis* v. *Parker*, 187 U. S. 606, 47 L. Ed. 323, 23 Sup. Ct. Rep. 168, 170, and *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157, 57 L. Ed. 164, 33 Sup. Ct. Rep. 66, 67; and in *Home Telephone Co.* v. *Los Angeles*, 211 U. S. 265, 53 L. Ed. 176, 29 Sup. Ct. Rep. 50, 55, it is declared that it is "a well-settled rule of constitutional exposition that, if a statute may or may not be, according to circumstances, within the limits of legislative authority, the existence of the circumstances necessary to support it must be presumed."

This last rule, in my opinion, is sound and in conformity with our own declarations quoted above and in the majority opinion.

"Legislation cannot be judged by theoretical standards. It must be tested by the concrete conditions which induced it."

(*Mutual Loan Co.* v. *Martell*, 222 U. S. 225, Ann. Cas. 1913B, 529, 56 L. Ed. 175, 32 Sup. Ct. Rep. 74, 75; see, also, *Tanner* v. *Little,* 240 U. S. 369, 60 L. Ed. 691, 36 Sup. Ct. Rep. 379, 384, and *Yeiser* v. *Dysart,* 267 U. S. 540, 69 L. Ed. 775, 45 Sup. Ct. Rep. 399.)

In the instant case, on account of the short time intervening between the passage of the Act and the writing of the contract in evidence by the defendants then incorporated under the laws of the state, we may reasonably presume that the members of the legislature knew of the existence of this corporation and its purpose to solicit and write such contracts. I venture to say that the instant contract would be declared against public policy by any court in an action brought upon it, and that a business based solely upon the writing of such contracts would be suppressed.

But aside from the instant contract, which is unimportant here, such contracts as are described in the Act have, whenever and wherever they have come to the attention of courts of last resort, been declared, in no uncertain terms, to be contrary to sound public policy. (*State ex rel. Attorney General* v. *Wichita Burial Assn.,* 73 Kan. 179, 84 Pac. 757; *State* v. *National Burial Assn.,* 79 Kan. 28, 98 Pac. 1134; *State ex rel. Fishback* v. *Globe Casket Co.,* 82 Wash. 124, L. R. A. 1915B, 976, 143 Pac. 878, 879; *State* v. *Willett,* 171 Ind. 296, 23 L. R. A. (n. s.) 197, 86 N. E. 68, 71; *Southwestern Burial Assn.* v. *Read,* (1929) 135 Okl. 151, 63 A. L. R. 704, 274 Pac. 642; *Fikes* v. *State,* 87 Miss. 251, 39 South. 783; *Renschler* v. *State,* 90 Ohio St. 363, Ann. Cas. 1916C, 114, L. R. A. 1915D, 501, 107 N. E. 758.) May this fact not also have been known to our legislature?

In the Indiana case the court said: "The whole system is, in real design, but the scheme of an undertaker to promote his private business, largely at the expense of persons of small means. A wise public policy demands that the laws be liberally construed to circumvent any attempt, by such bodies, to evade the reasonable and beneficent restraints of the statute."

In the Washington case the court declared: "The contract is not one that the courts will strain the laws to uphold. It is freighted with the greatest possibilities for fraud. The corporation * * * is not required to have or keep any paid-up capital. Its duration is limited * * * the officers * * * may handle and dispose of the funds received * * * in any manner they please. It is certain that many of these certificates will not be ripe for redemption for a number of years, and it is reasonably certain that some of them will survive the life of the corporation itself. If, therefore, the company were permitted to continue the business, and all or any considerable proportion of these certificates were ever redeemed, it will be a consummation unique in human experience."

It seems to me that the reasoning in these cases amply demonstrates that our legislature was faced with a real evil to be combated, and the mere fact that we can conjure up contracts which might not, in our private opinions, be objectionable is no ground for condemning the Act designed to eradicate that evil, or that the Act does not cover the whole field, exempting, as it does, from its provisions oral contracts of like nature.

"A legislature [state] * * * may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. * * * If a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the 14th Amendment allows it to be dealt with, although otherwise and merely logically not distinguishable from others not embraced in the law." (*Central Lumber Co.* v. *South Dakota*, above.)

In the exercise of the police power, citizens may, for the public good, be constrained in their conduct with reference to matters in themselves lawful and right. (*City of Butte* v. *Paltrovich*, 30 Mont. 18, 104 Am. St. Rep. 698, 75 Pac.

521; see, also, *Rifle Potato Growers' Assn.* v. *Smith,* 78 Colo. 171, 240 Pac. 937; *Pohl* v. *State,* 102 Ohio St. 474, 132 N. E. 20; *Des Moines* v. *Manhattan Oil Co.,* 193 Iowa, 1096, 23 A. L. R. 1372, 184 N. W. 823, 188 N. W. 921.)

The choice of method for the eradication of an acknowledged evil lies with the legislature and, although we may disagree as to the wisdom of the choice, we should not for that reason alone condemn the law.

"It by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree" (*Otis* v. *Parker,* above); or as put by Mr. Justice Holmes in *Arizona Employers' Liability Cases,* 250 U. S. 400, 432, 6 A. L. R. 1537, 63 L. Ed. 1058, 39 Sup. Ct. Rep. 553, 560: "If it is thought to be public policy to put certain voluntary conduct at the peril of those pursuing it, whether in the interest of safety or upon economic or other grounds, I know nothing to hinder." This broad view of public policy might appear to "draw everything into its maw" and prevent judicial interference with legislative action (40 Harvard Law Review, 966), but this situation is prevented by the exercise of the power to declare Acts arbitrary and unreasonable and, therefore, void.

However, when it appears that the legislature was confronted by an actual evil, and has adopted a method of preventing injury therefrom, even though it incidentally condemns certain apparently innocuous transactions, the Act of regulation does not violate any of the constitutional guaranties and a court interferes only by the employment of strong-arm methods, for "as to what extent legislation should interfere in affairs political philosophers have disputed and always will dispute. It is not in our province to engage on either side." (*Tanner* v. *Little,* above.)

"The power which the legislature has to promote the general welfare is very great, and [its] discretion  *  *  *  in the employment of means to that end, is very large." It is not

within the functions of the court "to conduct investigations of facts entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in statutes, as they may happen to approve or disapprove its determination of such questions. * * * If all that can be said of this legislation is that it is unwise, or unnecessarily oppressive * * * their appeal must be to the Legislature, or to the ballot-box, not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government." (*Powell* v. *Pennsylvania,* 127 U. S. 678, 32 L. Ed. 253, 8 Sup. Ct. Rep. 992, 996, 1257.)

On the precise question before us, in discussing "Due Process, Police Power and the Supreme Court," Ray A. Brown (40 Harvard Law Review, 956) says: "It must be apparent that the criteria under which the court proceeds in all of these cases are almost wholly subjective and that no assistance is to be gained from the words of the [Fourteenth] Amendment itself. But if the standards of the court in determining what means are justifiable thus seem to be subjective, what shall be said of the requirement that the statute must not be beyond the boundaries of the police power, subversive of constitutional rights, arbitrary or unreasonable? Whence is the judge to obtain his knowledge of what is for the 'public good,' 'general prosperity' or 'the greatest welfare of the people'? In the main he must either accept the legislative judgment or substitute his own. The Constitution is silent on the subject, save in the due process clause, and here the standard turns back upon itself and becomes a futile whirligig wound up for eternity. The adjectives 'arbitrary, 'unreasonable' and 'oppressive' find no definition in the written law but must be applied in the light of the judge's own mental processes; often the court must content itself with the mere statement that the purpose of the subject-matter of the law is beyond the state's power." This, in my opinion, is a clear exposition of the maze into which the court enters when it attempts to balance the conceivable injury that may be done by permitting

a statute to stand against the clear benefit that will accrue to the people, after finding that an evil does exist, and that the method adopted will correct that evil. I am convinced that this power to substitute the judgment of the court for that of the legislature should only be exercised when, as in the *Gas Products Case,* an Act is "beyond a reasonable doubt" arbitrary, and unreasonable, and strikes at clear fundamental constitutional rights.

Here the legislature, in effect, said: "We have before us a species of contract, coming into use in our state, which has everywhere been declared against public policy; we will, therefore, declare all such contracts illegal and void and fix a penalty for soliciting them." The majority of the court say: "Although the evil may be apparent, we disapprove of the method adopted for eradicating the evil and, therefore, condemn the law."

In the cases cited above, showing the evil of such contracts and declaring them against public policy, the courts, in the absence of legislative action "liberally construed" the law in order to prevent those writing such contracts from operating, by declaring them, in effect, insurance companies operating without complying with the insurance regulations. Whether our state officials and courts will follow this precedent or not is problematical, but the concession that they might is an admission that legislative action was proper.

Freund, in his work on Police Power, justifies the regulation of insurance companies by likening insurance policies to "wagering contracts" and declares that the insurance business becomes legitimate only when undertaken on a large scale by organized capital, and properly restricted. To my mind, the contracts in the Act declared illegal partake more of the nature of wagering contracts than do the ordinary insurance contracts; they are akin to the contracts and transactions prohibited in the regulation of the sale of stocks; (sec. 4032, Rev. Codes 1921); such sales on margin for future delivery (*Parker* v. *Otis,* 130 Cal. 322, 92 Am. St. Rep. 56,

62 Pac. 571, 927, affirmed 187 U. S. 606, 47 L. Ed. 323, 23 Sup. Ct. Rep. 168; *Booth* v. *People,* 186 Ill. 43, 78 Am. St. Rep. 229, 50 L. R. A. 762, 57 N. E. 798, affirmed 184 U. S. 425, 46 L. Ed. 623, 22 Sup. Ct. Rep. 425); lotteries, raffles and gift enterprises (secs. 11149, 11150, Rev. Codes 1921); gambling (sec. 11159, Id.); betting on races (sec. 11180, Id.), and confidence games (sec. 11411, Id.). All of these, with the Act under consideration, are in my opinion, statutes ''designed in part to protect credulous persons against their own inherent weakness, a weakness akin to the gambler's hope of winning a prize,'' as was said with reference to the ''Blue Sky'' Law of Oklahoma. (*Hornaday* v. *State,* 21 Okl. Cr. 354, 208 Pac. 228.)

I cannot agree that the regulation of the undertaking business contained in the Act is ''beyond a reasonable doubt'' arbitrary or unreasonable; on the contrary, I believe it to be a reasonable regulation within the constitutional power of the state and am firmly convinced that the judgment of the trial court should be affirmed.

MR. JUSTICE FORD: I concur in the views expressed by MR. JUSTICE MATTHEWS above.