### MEADOWS et al. v. EDWARDS et al.

#### No. 5187.

Court of Civil Appeals of Texas. Texarkana.

March 17, 1938.

Rehearing Denied April 21, 1938.

W. H. Sanford, of Dallas, C. E. Florence, of Gilmer, and Conan Cantwell, of Dallas, for plaintiffs in error.

King, Wheeler & Fulton and Edwin M. Fulton, all of Texarkana, for defendants in error.

HALL, Justice.

This suit in the form of trespass to try title was brought by defendants in error, hereinafter called appellees, against plaintiffs in error, hereinafter called appellants, for title and possession of a tract of land containing 1.6 acres, a part of the Ferguson survey located in Upshur county, Tex. Appellees, in addition to their statutory action, alleged that the land in controversy has been devoted since 1912 to a cemetery, and has been so used continuously since said date. They alleged that the legal title to $^{27}/_{40}$ interest therein was in them. They also pleaded the 10-year statute of limitation, Vernon's Ann.Civ.St. art. 5510. All the appellants, except J. B. Cowden, answered by general demurrer, general denial, and plea of not guilty. Appellant Producers Construction Company answered further to the effect that it had drilled two oil wells on said land under a contract with its codefendant (appellant) Alger Oil Company, at a cost of $12,420 each, which was reasonable; that it "relied upon an oil and gas lease of record which was owned by the said Alger Oil Company, and this defendant had no notice of any invalidity in said oil and gas lease"; that one of the leases to an undivided interest in this property was executed by appellees; . that it held deeds of trust against the leasehold interest of the Alger Oil Company in said land to secure the indebtedness due it and that it drilled the two wells in good faith, believ-

ing that the Alger Oil Company had a good title to the leasehold interest claimed by it. The appellants D. H. Sanford, C. W. Meadows, and the Alger Oil Company, in addition to the foregoing, pleaded estoppel based upon the facts: (1) That only a small portion of said tract of land was or has ever been devoted to the burial of the dead, namely, the fenced-off southeast corner thereof; and (2) that appellees "have at various times executed oil and gas leases upon and covering the tract of land described in their petition and have agreed to and have encouraged the drilling of oil wells thereon, and by their acts and conduct have represented and held the same out to the world, and to these defendants (appellants) in particular, as not being dedicated or devoted to the burial or interment of the bodies of the dead or to cemetery purposes," etc.; that said land was not in its entirety devoted to cemetery purposes but only a small portion thereof in the southeast corner.

At the conclusion of the testimony the lower court instructed the jury to return a verdict for the appellees and judgment was entered accordingly, from which appellants prosecute this appeal.

The 1.6-acre tract of land in controversy is a part of a 112-acre tract purchased in 1903 by John O'Byrne from Ellen Todd and Mary English, sole surviving heirs of J. R. Edwards, deceased. J. R. Edwards came into possession of this 112-acre tract of land by gift from his father, John K. Edwards, in 1869. The evidence discloses that there were a few graves in this plot of ground as early as 1872 and appellee J. K. Edwards testified that he remembered as far back as 1894 and that there was a fence around the part of the land containing the graves. No reservation describing this cemetery appears in the deed from John K. Edwards to his son, J. R. Edwards, or in the deed from Ellen Todd and Mary English to John O'Byrne. In 1912 John O'Byrne conveyed the 1.6-acre tract of land in controversy to J. W. C. Edwards, father of appellees, the deed to which contained the following recital: "That I, John O'Byrne, of the County of Upshur, and State of Texas, for and in consideration of a cemetery or place of burial have granted, sold and conveyed, and by these presents do grant, sell, give and convey unto the said J. W. C. Edwards," etc.

The deed continues with the description of the land and is in all respects a general

warranty deed. Appellees are part of the heirs of J. W. C. Edwards, and appellants are their lessees and assignees of their lessees under an oil and gas lease covering the land in controversy. Since the execution of the O'Byrne deed only 4 persons have been buried in this cemetery; the grantee, J. W. C. Edwards, in 1913; a daughter in 1915; his wife in 1920; and a son in 1923. Since 1923 there has been no interment in the cemetery. There are now 25 graves in said cemetery. It was fenced in 1931 by appellee J. K. Edwards, and is about 20 steps by 30 steps long, and is located in the southeast corner of the 1.6-acre tract and contains space for 50 to 70 more graves. It is also undisputed that the fence was in approximately the same position when development for oil and gas was begun on this land as it was in 1931. Appellees have completed two oil wells on this land, one to the north and one to the west of the cemetery and wholly on the outside of the inclosure fenced off for burial purposes.

■ On the trial of this case in the lower court appellants were not permitted to introduce in evidence before the jury the oil and gas lease from appellees and the assignments thereunder to them, on the ground that said instruments are in contravention of public policy and are therefore void, but each of said instruments were admitted in evidence before the court. This presents the controlling question in this case. Under this record undoubtedly the legal title to this 1.6-acre tract was in J. W. C. Edwards by virtue of the deed to him from O'Byrne, and at his death descended to his heirs, some of whom are appellees. Barker v. Hazel-Fain Oil Co., Tex.Civ. App., 219 S.W. 874, writ refused. Appellees could sell their interest in this land to whomsoever and at any time they desired, with or without reservation of the part used for a cemetery, and the purchaser would take the legal title thereto impressed with the same use expressed in the grant from O'Byrne to Edwards. This brings us to the question: Was the dedication expressed in the O'Byrne deed and the subsequent uses and possession of this property by the Edwards family of such nature as to characterize it as a public cemetery? We think not. As said before, this little cemetery had its beginning prior to 1872, long before O'Byrne acquired title to it, and, except for only 4 or 5 interments in the earlier years, during all this time down to the present, no others than members of

the Edwards family have been buried therein. The provision in the O'Byrne deed "for and in consideration of a cemetery or place of burial" does not expressly or impliedly designate this property as a public cemetery. The acts and conduct of the Edwards family towards this cemetery shows conclusively that they regarded it as private in character. After the execution of the O'Byrne deed only 4 persons have been buried therein and they were members of the immediate Edwards family. Appellee J. K. Edwards alone looked after the upkeep and beautification of the plot where the graves were located. He constructed the fence around same in 1931, and has used the timber on the land outside the cemetery fence. This cemetery was known in the community as the "Edwards Graveyard." Appellees alleged in their petition that they and those under whom they claimed had been in continued and adverse possession of said land, using it continuously as a cemetery and place of burial for more than 10 years prior to the filing of this suit under a deed defining the boundaries thereof. The record also shows that appellees base their title to this land upon the deed from O'Byrne to their father. It cannot be successfully contended, in our opinion, that the deed from O'Byrne to Edwards was in anywise a grant for public cemetery for the further reason that there is no evidence in the record that the public after the grant was made accepted or used said land, or any portion thereof, for cemetery purposes. We conclude, then, that this cemetery was private in character with the fee-simple title thereto in the heirs of J. W. C. Edwards, granting, of course, that O'Byrne owned the legal title to same when he conveyed this land to Edwards, which, for the purpose of this opinion, we concede. Wooldridge v. Smith, 243 Mo. 190, 147 S.W. 1019, 40 L.R.A.,N.S., 752.

■ We shall next consider whether a part or all the 1.6-acre tract of land was dedicated to or used for cemetery purposes. We think the acts and conduct of appellees as reflected by this record conclusively answer this query. Until the appellants began operations for the drilling of oil wells on this tract of land, only the small plot in the southeastern corner of the tract containing the graves was used as a cemetery. However, additional ground was cleared and inclosed by the fence. This portion so fenced was adjacent to a public road. This cleared space where the graves are located, and possibly some additional land, was in-

closed by a fence as early as 1894. This fence rotted down by 1908, and the graveyard was not inclosed by another fence until 1931. The graveyard as now constituted was fenced by J. K. Edwards. The evidence shows that practically all the land outside the inclosure before the oil wells were drilled was covered with large trees and was "thickety." Appellee J. K. Edwards used timber off the unfenced portion of the land. This appellee testified further that none of the land on which the oil wells were located was inclosed by the cemetery fence, nor had that portion of the land ever been cleared off and used for cemetery purposes. In another suit prior to this action instituted in the name of these appellees, styled J. K. Edwards et al. v. Fred Todd et al., to set aside a judgment theretofore entered against them and other persons, perpetually enjoining them from drilling an oil well on this land, and in which suit they were successful, the following allegation is made: "Plaintiffs further allege that no part of the 1.16 acres herein described except the small portion herein specified set out and situated in the Southeast corner of said 1.16 acre tract is now being used as or has ever been used for the purposes of a cemetery and that said cemetery so located in that vicinity is confined to the boundaries of the tract of land located in the Southeast corner of said 1.16 acre tract as is herein specifically described and that the drilling of a well for oil and gas upon the remaining portion of the 1.16 acre tract at the point contemplated and where the derrick was located will in no wise interfere with nor desecrate said cemetery nor the graves therein. * * *"

These undisputed facts and circumstances, coming in the main from appellees, show, in our opinion, conclusively that only that part of this tract of land inclosed by the fence as it has existed since 1931 is impressed with and devoted to a cemetery. Houston Oil Co. of Tex. v. Williams, Tex. Civ.App., 57 S.W.2d 380, writ refused. And the oil and gas leases given by these appellees and their joint owners covering this tract of land, so long as operations thereunder were confined to the land outside the inclosed cemetery and no desecration thereof occurred, were not illegal, immoral, or against any phase of our public policy. In Cor.Jur., vol. 50, p. 857, § 62, public policy is defined to be: "The term 'public policy', being of such vague and uncertain meaning, and of such variable quantity, has frequently been said not to be susceptible of exact or precise definition; and some courts have said that no exact or precise definition has ever been given or can be found. Nevertheless, with respect to the administration of the law, the courts have frequently quoted and often approved of the statement that public policy is that principle of the law which holds that 'no one' can lawfully do that which has a tendency to be injurious to the public or against the public good; that rule of law which declares that no one can lawfully do that which tends to injure the public, or is detrimental to the public good; the principles under which freedom of contract or private dealing is restricted by law for the good of the community." Beasley v. Texas & P. Ry. Co., 191 U.S. 492, 24 S.Ct. 164, 48 L. Ed. 274; C. C. Slaughter Cattle Co. v. Potter County, Tex.Civ.App., 235 S.W. 295, affirmed by Supreme Court, 254 S.W. 775; State v. Gateway Mortuaries, 87 Mont. 225, 287 P. 156, 68 A.L.R. 1512.

■ The appellants are not trespassers on this property. On the contrary, they have drilled to completion and are now operating two producing oil wells thereon, one 59 feet north of and the other 193 feet west of the northwest corner of the cemetery as fenced and segregated by appellees, under and by virtue of oil and gas leases, one of which was executed to their assignors by these appellees. Appellee J. K. Edwards testified that he leased the land to appellants' assignors for the purpose of developing the land outside the inclosure and not being used as a cemetery, for the purpose of "improving the cemetery." He testified, further, that he gave or executed the lease as their authority to go upon the land, not used as a cemetery, and develop it. This appellee testified still further that he knew the wells were being drilled; that he passed by the premises during the time they were being drilled; that he made no protest. He also testified that he notified appellants' attorney, Mr. Davis, "last October, I believe,—about the last of October, that time was growing short, and if they didn't get on and drill by the first of December the thing was up and there was not going to be any drilling done." That he demanded the lessees to get on the lease and drill it. The record discloses further that appellees accepted rentals, under their lease on this land, from appellants. If this record revealed that appellants were desecrating any portion of this little cemetery,

quite another case would be before us. But the evidence is conclusive that there has been no desecration of the graves. No oil has been allowed to mar them or the stones marking the graves. No rubbish nor personal property has been allowed within the inclosure containing the graves. All the brush and undergrowth has been cleared away from the land outside the cemetery and there now remains the bare producing oil wells and the oil storage tanks. As said before, the two oil wells on this land have already been completed and are now producing oil, hence no more damage or desecration would result from allowing appellants to produce oil from them than would result from allowing similar production by appellees. We conclude, then, from all the facts and circumstances of this record, that the law will not permit appellees, the holders of the legal title to this land, and lessors in the oil and gas lease under which appellants are in possession of same, to eject appellants therefrom; nor will equity afford them any relief; but, on the contrary, will effectively estop appellees in their efforts because of their acts and conduct as reflected by this entire record. We have found no case in the books similar to this one, nor have we found any contrary to this holding. The record discloses no answer filed by J. B. Cowden.

The judgment of the lower court is reversed, and is here rendered for all appellants, except J. B. Cowden, and as to him it is affirmed.

On Motion for Rehearing.

In our original opinion we did not consider the issue raised by appellant J. B. Cowden on the theory that he filed no answer in the lower court. It has been made to appear that Cowden did file an answer in the court below and we shall consider the question raised by his appeal.

J. B. Cowden claims a one-half undivided interest to the fee in the land in controversy by virtue of a quitclaim deed dated December 3, 1932, from Ellen Todd Wantland and her husband, C. E. Wantland, to him, covering the land in controversy in this suit. The record discloses that Ellen Todd Wantland is the same person as Ellen Todd. On January 19, 1903, Ellen Todd and her sister, Mary English, sole surviving heirs of J. R. Edwards, conveyed a tract of land, of which the land in controversy is a part, to John O'Byrne. At the time of making this conveyance to O'Byrne,

Ellen Todd was a married woman and was not joined therein by her husband. It is the contention of plaintiff in error Cowden that this conveyance noted last above to O'Byrne was ineffective to pass the title of Ellen Todd to the land in controversy and that he became the owner of an undivided one-half interest therein by virtue of the quitclaim deed to him from Ellen Todd Wantland and husband, C. E. Wantland, of date December 3, 1932. The question of the nature of the property conveyed by the deed from Ellen Todd and her sister, Mary English, to O'Byrne in 1903, and the effect of said conveyance, was passed upon by this court in the case of Wantland v. Cowden, 87 S.W.2d 529, writ dismissed, wherein Judge Sellers, speaking for this court, said (page 533): "If we are correct in the conclusion above reached, it follows that there was no valid location of this certificate after 1871, when the first location was rendered null and void, before the conveyance of the certificate by appellant Mrs. Wantland to O'Byrne. And for that reason the certificate on that date must be treated as personal property and not subject to the statutes with reference to the conveyance of the wife's separate real estate. Since appellants' claim of title to the land is predicated entirely upon the theory that such certificate on the date of the conveyance to O'Byrne was to be treated as realty, they must be denied a recovery in this case."

We regard this opinion as sound and as constituting the law of this case so far as the rights of plaintiff in error Cowden are concerned.

The judgment of the lower court will be affirmed in so far as same affects J. B. Cowden.

Defendants in error in their motion for a rehearing, among other contentions, state that our opinion handed down on March 17, 1938, divests out of them their one-eighth royalty interest in an undivided $27\!/\!40$ of the land in controversy. It was not our intention to do so. This suit being one in which the leasehold to the $27\!/\!40$ interest alone (except as to J. B. Cowden) was involved, we leave undisturbed the interest of the parties to the one-eighth royalty in said tract of land.

It is also contended that our opinion left as a charge against defendants in error the sum of $16,767, found by the trial court to be the value of the improvements made in good faith placed on said land by plaintiffs in error. We do not think the original opin-

ion is subject to this criticism, but, to avoid any misunderstanding with respect to this item, we state that the judgment of the trial court relating to this charge is also reversed and held for naught.

The motion for rehearing is overruled.