322

Strafford, }
May 6, 1930. }

## STATE v. THE LOTHROPS-FARNHAM CO., INC.

*Burt R. Cooper*, solicitor, *Guy Smart* and *Jennie Blanche Newhall* (*Miss Newhall* orally), for the state.

*Frank T. Wolcott, Stuart McNamara* and *Thomas E. Dewey* (all of New York) and *Warren, Howe & Wilson* (*Mr. McNamara* and *Mr. Robert P. Bingham* orally), for the defendant.

MARBLE, J. The defendant is a corporation organized under the laws of this state. It is not engaged in the business of selling trading stamps to merchants and therefore need not obtain a license. P. L., *c.* 173, *ss.* 1, 12. Moreover, it is not charged with a violation of any provision applicable to tradesmen who deliver such stamps in connection with sales of merchandise. Consequently its motion to

quash the information as it now stands should be granted. Since, however, the information is subject to amendment in the superior court (P. L., c. 367, s. 12; *State* v. *Weare*, 38 N. H. 314, 316), the question of the constitutionality of the statute has been considered.

The stamps used by the defendant were procured from the Sperry & Hutchinson Company, a foreign corporation, under a contract with that company. By the terms of the contract the defendant delivers stamps to its customers at the rate of one stamp for every ten-cent cash payment. These stamps are collected by the customers in books, and the books are redeemed by the Sperry & Hutchinson Company either in cash or in merchandise selected from a catalogue.

The method employed does not differ in essential particulars from that described in *State* v. *Ramseyer*, 73 N. H. 31, 32, and in that case a statute designed to prohibit the use of trading stamps by merchants (Laws 1899, c. 60) was held to be void as an unwarrantable interference with the constitutional right of acquiring and possessing property.

While the present statute purports to be regulatory, the provisions requiring a deposit of $10,000, the payment of a license fee of from $250 to $1,000, and the levying of excise taxes amounting to ten per cent of the licensee's sales of stamps and three per cent of the merchant's gross receipts are virtually prohibitive.

The state seeks to distinguish this case on the ground that the statute in *State* v. *Ramseyer* was not intended as a police measure, while P. L., c. 173, s. 4, expressly recognizes the fact that the trading stamp business may be attended with fraud and imposition. This, however, is equally true of all business. And although the reasonableness of a statute relating to public welfare is not ordinarily a question on which the court can properly pass (*State* v. *Jackson*, 71 N. H. 552, 554; *Sundeen* v. *Rogers*, 83 N. H. 253, 256, 257, and cases cited), the right of acquiring and possessing property is guaranteed to all persons by the constitution (Bill of Rights, *art.* 2), and the mere statement in a legislative enactment that a particular business may be fraudulently conducted does not give the legislature power to prohibit that business either in terms or in effect. See 12 C. J. 929-934, and cases cited.

Certainly there is no more evidence now than existed at the time the earlier decision was rendered to indicate that trading stamp transactions as such involve any element of chance or deceit. Indeed, the court in *Rast* v. *Company*, 240 U. S. 342, on which the state chiefly relies, concedes that the business is neither a lottery nor gaming.

It is further suggested that the views of legislators and economists have changed in the years which have intervened since the passage of the original statute, and that there is now a wide-spread and definite conviction that the use of stamps, coupons, or similar devices, as a stimulus to trade is subversive of public morals. This view finds support in the *Rast* case.

That case was considered by the supreme court of the United States together with *Tanner* v. *Little*, 240 U. S. 369, and *Pitney* v. *Washington*, 240 U. S. 387. The question raised in each of these cases was the validity of state laws imposing prohibitive restrictions on the use of trading stamps or premium tokens. All three decisions were rendered the same day and each sustained the constitutionality of the particular statute in controversy, holding that neither the due process nor the equal protection clause of the fourteenth amendment had been violated.

It is well recognized that courts are reluctant to declare any avowed exercise of the police power in contravention of the fourteenth amendment. Nevertheless, the police power "has its limits and must stop when it encounters the prohibitions of the Constitution." *Eubank* v. *Richmond*, 226 U. S. 137, 143. A necessary inquiry is whether there has been a "wanton or arbitrary interference with private rights." *Atlantic Coast Line R. R. Co.* v. *Goldsboro*, 232 U. S. 548, 559. And "where legislative action is within the scope of the police power, fairly debatable questions as to its reasonableness, wisdom and propriety are not for the determination of courts, but for that of the legislative body on which rest the duty and responsibility of decision." *Standard Oil Co.* v. *Marysville*, 279 U. S. 582, 584.

In the *Rast* case the court says (*p.* 357): "It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed."

Applying this rule to the problem, the court holds that a classification based on differences between a business using and one not using trading stamps is not so arbitrary as to deny the equal protection of the laws, and that so far as the infringement of business liberty under the due process clause is concerned, the schemes under consideration are more than mere advertising and have "insidious potentialities" which justify the restrictions in question as an exercise of police power. With respect to public welfare, importance is attached to the persistent efforts of legislatures since 1880 either to prohibit or to license the selling or use of trading stamps and

coupons, even though the great weight of judicial authority is admitted to be against the validity of such legislation.

The real danger believed to be inherent in the system under review is its so-called "appeal to cupidity." Conceivably the purchaser may be lured to improvidence by the promise of a value greater than the article bought and apparently not represented in its price. "This," the court explains (*p.* 365), "may not be called in an exact sense a 'lottery,' may not be called 'gaming'; it may, however, be considered as having the seduction and evil of such."

The *Rast* case and its companion cases have received criticism, some of it not altogether devoid of humor. In 20 Law Notes 161, it is said that since the supreme court declines to consider the wisdom of the legislation and the legislative department rarely discloses its motives, "the consumer will probably remain forever in doubt as to what is the peril from which he has been so valiantly (and expensively) delivered."

In his article on "Due Process, Police Power and the Supreme Court," 40 Harv. Law Rev. 943, Ray A. Brown says (*pp.* 952-954): "While it might seem that the question of what the welfare of the people demands should be left to the legislature, the Court has always reserved to itself the power of deciding whether a given statute 'is to be accepted as a legitimate exertion of the police power of the State' and has said that if the statute has 'no real or substantial relation' to the objects of that power or 'is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.' In this formula three separate requirements are laid down: (1) the object of the legislature must be permissible; (2) the means must have a substantial relation to the end; and (3) fundamental rights must not be infringed. Later cases have added the further qualification that the law in question must not be arbitrary, unreasonable or oppressive.

"It must be apparent that this reservation of power contains no very certain standard to guide the Court in drawing its judgments. Certainly it seems that only in rare instances could the Court pronounce that the means employed by the statute were unrelated to the ends. There are, however, a few cases where the question might reasonably be considered. While there can be no doubt that vaccination bears a substantial relationship to the prevention of epidemics, it is perhaps not so clear that a cemetery has an injurious effect upon health, or that two years' service as a freight brakeman is necessary

to assure the efficiency of an employee as a railway conductor. One may also ask whether protection against fraud and impure food justified the outlawry of oleomargarine and of 'filled milk' and whether the trading stamp was the 'lure to improvidence' which the Court thought probable in *Rast* v. *Van Deman & Lewis Co.*"

Since 1916, when the decision in the *Rast* case was announced, not all state courts have felt it incumbent upon them to adopt the views therein expressed. *Denver* v. *Company*, 68 Colo. 363; *Lawton* v. *Company*, 197 Ky. 394; *Opinion of the Justices*, 226 Mass. 613.

The language of the court in *Adams* v. *Tanner*, 244 U. S. 590, decided a year subsequent to the *Rast* case, is significant. The validity of a state statute prohibiting employment agencies from collecting fees from workers for whom positions were found was there held to be unconstitutional. In the course of the opinion it is said (*p.* 594): "Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skilfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked."

Among the dissenting justices in *Adams* v. *Tanner* was Mr. Justice *McKenna*, the author of the opinion in the *Rast* case. His dissent is stated to be "upon the ground that under the decisions of this court—some of them so late as to require no citation or review,— the law in question is a valid exercise of the police power of the state, directed against a demonstrated evil."

The defendant suggests that the stamps which it issues are not within the contemplation of P. L., *c.* 173, since section 26 describes the stamps to which the act applies as those given "in consideration of any article or thing purchased"; *i. e.*, tokens offered in exchange for patronage, whether the goods purchased are paid for or not; while the giving of stamps under the defendant's system is "merely one way of discounting bills in consideration for immediate payment in cash." *Ex parte Hutchinson*, 137 Fed. Rep. 949. Against this system, it is urged, the "lure to improvidence" cannot possibly be charged.

It is unnecessary, however, to consider this or various other arguments which the defendant advances. The question here presented

involves the interpretation of the constitution of New Hampshire, and that question is for the determination of this court. 6 R. C. L. 85; *Williams* v. *State*, 81 N. H. 341, 352. It is sufficient to say that after due consideration of the federal cases and after a careful examination of the statute and the evidence we find nothing which leads us to a different conclusion from that reached in *State* v. *Ramseyer*.

*Information quashed.*

All concurred.