GARDEN SPOT MARKET, INC., a Montana Corporation, Plaintiff and Respondent, and Gordon's Jewelry, Inc., Plaintiff, Intervenor and Appellant, v. E. J. BYRNE, DAN FULTON and JOHN C. ALLEY, as Members of and Constituting the State Board of Equalization of the State of Montana, Defendants and Appellants, and ROBERT ABEL, Defendant and Appellant.

No. 10528
Submitted December 17, 1962. Decided January 24, 1963.
378 P.2d 220.

Patrick F. Hooks (argued), John R. Kline (argued), Edwin S. Booth (argued), Cordell Johnson, Helena, for appellants.

Henry Loble (argued), Helena, Jerome Anderson (argued), Billings, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is what has been described as "The Killum Dead Trading Stamp Case." An unknown reporter fashioned the title for the Thirty-seventh Legislative Assembly's Chapter 153 of the Session Laws of Montana, 1961, and that appellation appears in the record before us.

This appeal involves a question of the constitutionality of Chapter 153, Laws of Montana, 1961.

In summary, Chapter 153, hereinafter referred to as the Act,

provides that every individual, partnership, corporation, association, or any other organization with a place of business in the state, who, with the retail sale of merchandise or service, for any marketing purpose advertises the giving of or gives any stamp, coupon, certificate, ticket, card or similar device which is redeemable in merchandise, service or cash, shall be subject to an annual license tax of $100 plus two percent of his total gross receipts received from the sale of merchandise at such place of business during the preceding calendar year. Every person or business entity who "sells directly to the consumer" including "any manufacturer, processor, distributor, jobber, wholesaler, retailer or any combination thereof engaged in selling directly to the consumer" is considered a retailer for the purpose of the Act.

Redeemable devices used by the manufacturer or packer of an article in advertising or selling it, or any redeemable device issued and redeemed by a newspaper, magazine or other publication is exempt by section 2 of the Act.

The remaining sections of the Act provide that the State Board of Equalization shall promulgate application and license forms and provide for the filing of applications for a license on or before January 1, following the effective date of the Act, which is June 30, 1962.

Any person referred to in section 1 of the Act who fails to pay the license tax, or any part thereof, when due, is made liable for three times the amount of the tax which was due, and may be enjoined from continuing to issue redeemable devices.

This action, for a declaratory judgment declaring Chapter 153 unconstitutional, and to enjoin its enforcement, was brought by Garden Spot Market Inc., plaintiff and respondent, against the State Board of Equalization. Gordons Jewelry, Inc., intervened as a party plaintiff, and Robert Abel intervened as a party defendant.

For clarity, hereinafter Garden Spot will be referred to

as plaintiff, intervenor Gordons Jewelry as Gordons, the State Board of Equalization as the Board, and intervenor Abel as Abel.

The record contains a hard-fought pleading route through the district court. The action finally came on for trial before District Judge W. W. Lessley in September 1962. On October 20, 1962, Judge Lessley made separate, detailed findings of fact and conclusions of law, holding the Act unconstitutional and void. Judgments permanently enjoining enforcement of the Act were entered on November 7, 1962, whereupon this appeal was had. The Board and Abel are appellants while intervenor Gordons, respondent as to most questions, cross-appealed on one matter only.

The findings will be enlarged upon later. Suffice to say, the trial court found the Act unconstitutional on numerous grounds, making a conclusion that the only thing about the Act that was constitutional was its title. As to this even Gordons cross-appealed. Thus we have a "broadside" problem of constitutionality presented.

We shall briefly summarize the testimony of the witnesses in order to orient our inquiry. In order to further orient our inquiry we also make these observations. The Act itself makes *no* legislative findings. The title of the Act begins: ''An Act to *Regulate* the Giving or Furnishing of Trading Stamps or Other Similar Devices * * *.'' Emphasis supplied. Yet in the body of the Act *nothing is regulated*.

Richard Pinsoneault, the first witness called by plaintiff, testified that he canvassed the state to obtain examples of redeemable devices other than those commonly known as trading stamps. He gave many and various examples of devices used for promotional and advertising purposes. The examples ranged from tickets, which, when stamped by certain merchants, were redeemable for free parking, to a newspaper advertisement which could be redeemed at a hardware store for a photograph. They included coupons or devices

used by manufacturers, packers, and producers from outside the state in sales at the retail level within the state, and trading stamps and other devices offered from out-of-state mail order merchants in connection with mail order sales to Montana residents.

Upon cross examination, Mr. Pinsoneault testified he did not investigate the cost to the merchants of the use of the devices, and that he did not investigate the financial arrangements under which any of the promotional plans were carried out.

The second witness for plaintiff, Paul Stewart, President and Manager of plaintiff store, testified that plaintiff used and wished to continue to use a wide variety of redeemable devices in promoting sales; that continuously since June 15, 1952, plaintiff used trading stamps, and such use increased sales volume and helped establish a more steady clientele. Mr. Stewart testified that a tax based on two percent of plaintiff's gross sales would prohibit the use of trading stamps by plaintiff since it could not afford to pay such a sum; and plaintiff's markup could not be increased to pay the tax because plaintiff could not then meet competition.

Upon cross examination, Mr. Stewart testified that the stamps cost two percent of gross sales. The reason why plaintiff could pay that amount and continue to show the same net profit, as was realized before the use of stamps, was that the use of stamps increased sales volume while operating expenses increased only slightly and fixed costs remained the same. He said that the manufacturers' coupons, identified on direct examination, cost plaintiff nothing. He testified that when plaintiff began using stamps none of its competitors used them, but subsequently plaintiff's major competitors began using some brand of trading stamps.

In lieu of testimony by the Chairman of the State Board of Equalization, by stipulation, his answers to seven interrogatories of plaintiff were received in evidence. The substance

of the interrogatories is that the Board could not tell in advance what the administration of the Act would cost or what the cost to the Board would be to regulate plaintiff if it were licensed under the Act, but that the cost of processing an application for a single license should be $1.00.

On behalf of Gordons it was established that Gordons could not afford to pay a license fee if required under the Act. It was admitted in the pleadings that among the sales promotion devices used by Gordons are coupons which are given to customers with minimum purchases and which are redeemable from certain moving picture theaters for admission to movies and merchandise from the theater confectionary counter. It was also admitted that the aforementioned coupons constituted redeemable devices within the meaning of the Act. It was shown that Gordons opened a retail store in Helena in August 1962, and that the store building used by Gordons formerly had been occupied by another jeweler, but that Gordons did not purchase any assets of the other jeweler and there was no connection between the business of the two.

Subject to objections, which are not now important, a deposition of Abel and some exhibits were admitted into evidence. Abel, an independent service station operator, leases from Texaco and handles Texaco petroleum products. He also sells tires, batteries and accessories and does greasing, washing and minor tuneup and repair work. He has some parking space and allows regular customers to park there, but he does not operate a parking business as such.

Abel gave trading stamps from February 1960, to some time in October 1960. He quit giving stamps without relation to the other dealers. Most of the other dealers stopped stamps but there are about six, including some Texaco dealers, giving stamps now.

Abel's business volume has constantly increased, notwithstanding the fact that he dropped giving trading stamps, and the six other dealers continue to use them. Abel did not in-

crease prices when he began using stamps, nor did he decrease prices when he discontinued their use.

Abel has also used other promotional devices including discounts at certain times for certain services, certificates put out by Texaco to be redeemed for specials on merchandise, and other promotional devices distributed by the manufacturers of products sold by Abel.

Charles Davis, who operated a grocery store in Columbus, Montana, testified for Abel. Mr. Davis and his competitor used trading stamps, but after talking it over they gave up the use of stamps. If his competitor was to resume giving stamps, he believes he would have to also. He testified that he had an increase in volume when he began using stamps, but he could not recover the cost of the stamps out of the increase so he had to take the cost out of profits. Consequently, he did not increase prices when he began giving stamps, nor did he decrease prices when he dropped them.

The district court made and entered separate findings of fact and conclusions of law in favor of plaintiff and Gordons. The court, in addition to other facts, found:

"That other merchants testified on behalf of the Plaintiff and the Defendant, including the Intervenor and Defendant. That in each instance said merchants had used a trading stamp service similar to that used by Plaintiff, and in each instance said merchants had experienced an increase in gross sales volume subsequent to the commencement of the use of trading stamps. That of those testifying, some found the use of trading stamps to be beneficial to their business and have continued their use. That others have discontinued the use of trading stamps, and although certain of their competitors now give trading stamps, those merchants who have discontinued the use of said stamps have maintained their business volume and net profits. *That in no instance was any evidence offered to the effect that any merchant who testified increased his retail prices because of the use of trading stamps.*

"That the use of trading stamps and other redeemable devices in connection with the retail sale of merchandise and services by merchants and business establishments in the State of Montana is voluntary. That those who do not desire to utilize said devices as trade and sale stimulants have not used the same, but have used other business methods to compete in the market place. That consumers may voluntarily accept or refuse to accept stamps or other redeemable devices from merchants in business establishments issuing the same. That no evidence appears that the use of trading stamps or other redeemable devices in connection with the retail sale of merchandise or services *has any effect upon the retail price of merchandise, services or commodities in this State.* * * *

"That the use of trading stamps and other redeemable devices in connection with the retail sale of merchandise and services by retailers and business establishments is a legitimate method of advertising and promoting the sale of merchandise and service and is common to the conduct of legitimate business enterprises as carried on within the State of Montana.

"That the use of trading stamps and other redeemable devices in connection with the retail sale of merchandise and service by retail merchants and other business establishments within the State of Montana does not affect the health, morals, welfare or safety of the citizens of the State of Montana.

"The Act purports to grant to retail merchants in the State of Montana the right to engage in the use of trading stamps and other redeemable devices in connection with the retail sale of merchandise or services upon the payment of the license tax provided for, without requiring the performance of any further conditions on the part of the license [sic]. That the Act, therefore, is a revenue, not a regulatory measure. That retail merchants desiring to obtain said license must pay therefore a license tax of $100 plus two percent (2%) of the gross receipts realized from the sale of merchandise from the store or place of business of the applicant during the calendar year preceding

the year in which the application is made. That during the history of Plaintiff's business operation its net profit has never amounted to two per cent (2%) of its gross receipts; in order to pay the license fee required for the privilege of issuing trading stamps. Plaintiff would be required to increase its prices by two per cent (2%) above its present competitive price level. That plaintiff could not charge two per cent (2%) more for the privilege of issuing trading stamps and remain in business, for Plaintiff has to meet its competitors' prices to maintain its customers; accordingly, the effect of the tax will be to prohibit Plaintiff's use of trading stamps or other redeemable devices. That the same will be true of other retail merchants similarly situated in the State of Montana.

"That retail merchants in the State of Montana commonly use many and varied forms of sales and business promotional techniques which include a wide variety of redeemable devices. The Act in question provides in part that any retail merchant who engages in any of the practices described in the Act without having first paid the license tax therein provided, or any part thereof when due, shall be mandatorily liable for three times the amount of the unpaid or delinquent tax; because of the ambiguities contained in the Act, it is difficult, if not impossible, for men of common intelligence and understanding to determine what activities may be engaged in by retail merchants within the State, without their first having obtained the license provided for under the terms of the Act. That because of said ambiguities, it is also difficult, if not impossible for said merchants to ascertain when said tax is to be paid, what period it covers, and how it is computed. That the said penalty provided for has no relation to the gravamen of any violation and is so excessive and oppressive that if Plaintiff were to make any mistake as to what the Act covers, or when the license was payable, or the period covered, or the amount of the tax, the penalty would cause a termination of Plaintiff's business operations. That the same would be true of other merchants in Montana similarly situated.

That the effect of the penalty is therefore, to prohibit Montana retailers from using redeemable devices and to financially endanger their business operations or even bankrupt them if they are misled by any of the Act's ambiguities.

"That the excessive, confiscatory and prohibitive nature of the license tax and penalties provided for in the Act in effect prohibits the carrying on of legitimate business practices in the State of Montana, although such prohibition is not necessary for the protection of the public health, morals, safety or welfare. * * *

"That no reasonable relation exists between the amount to be collected from the license taxes under the provisions of the Act and the amount of money to be expended in the administration and enforcement of the Act, the amount collectible for licenses under the provisions of the Act being so much in excess of the amount reasonably required for the administration of the Act as to indicate that the license tax prescribed in the Act could not have been based upon any possible estimate of the probable cost of supervision or administration, but rather indicating that the license tax provided for in this Act did not relate to the cost of supervision or administration, and, therefore, the general purpose and intent of the Act was to prohibit to Plaintiff and others similarly situated the privilege of engaging in the use of trading stamps and other redeemable devices in connection with the retail sale of merchandise or services in the State of Montana." (Emphasis supplied by the district court.)

In holding the Act unconstitutional the district court made and entered the following conclusions of law:

"The said Act is in violation of the Fourteenth Amendment to the Constitution of the United States and Sections 3 and 27, Article III, of the Constitution of the State of Montana, in that it deprives the Plaintiff and others similarly situated of liberty and property without due process of law, and denies to them the equal protection of the law.

"The said Act is in violation of Sections I and II of Article

XII of the Constitution of the State of Montana in that it asssesses and imposes a tax which results in unreasonable and arbitrary discrimination.

"The said Act is in violation of Article XII of the Constitution of the State of Montana in that it levies a tax not for a public or governmental purpose, but on the contrary, for a private purpose.

"The said Act is in violation of Section 20, Article III, of the Constitution of the State of Montana, in that it imposes an excessive fine.

"The said Act is in violation of the Fourteenth Amendment to the Constitution of the United States, as well as of Sections 3 and 27 of Article III of the Constitution of the State of Montana, in that Section 4 of the Act provides for a tax unrelated to the purpose of the Act.

"Unless restrained by this Court, the Defendants will enforce the Act and require the Plaintiff to pay the license fees required under the terms of the Act before advertising the giving of trading stamps or other redeemable devices, or giving trading stamps or other redeemable devices under the meaning and intent of the Act, in the conduct of Plaintiff's business, all to Plaintiff's great and irreparable damage.

"That the title of Chapter 153, Laws of 1961, meets the requirements of Article V, Section 23, of the Constitution of the State of Montana.

"The Plaintiff has no plain, speedy or adequate remedy in the ordinary course of the law."

Judgments were entered, holding the Act unconstitutional and void and enjoining the Defendant, State Board of Equalization from enforcing the Act. The Board, Abel and Gordons appealed. Gordons appealed upon the ground that the district court erred in concluding that the title of the Act met the requirements of section 23, Article V of the Montana Constitution.

The Board sets forth nine specifications of error, and Abel

sets forth fourteen. Although the specifications of error cited by the Board and Abel are numbered and worded differently they overlap and are essentially the same or similar. Therefore, we will treat both parties' specifications of error as one integrated group of specifications all going to the question of constitutionality.

■■ First, because a major difference in views exists between the parties on this appeal as to what are the applicable guidelines to be used in determining answers to problems presented by a statutory act of the Legislature, we shall resolve that difference.

The Board and Abel, appellant, urge their view that we must determine the answer from the language of the Act, and that if any set of circumstances could exist to justify the act of the Legislature, the circumstances must be presumed to have actually existed. They urge that we only look to the evidence presented to determine if there were some circumstances justifying the Act.

They urge this on the basis that the Act is *presumed* constitutional and valid until the contrary is clearly shown. Or stated another way, that the court will indulge every presumption in favor of its validity, and not condemn, if possible to uphold the Act. See State ex rel. Snidow v. State Board of Equalization, 93 Mont. 19, 17 P.2d 68, 18 P.2d 804; State ex rel. Fish & Game Comm'n of Montana v. District Court, 107 Mont. 289, 84 P.2d 798; Victor Chemical Works v. Silver Bow County, 130 Mont. 308, 301 P.2d 730; Parker v. County of Yellowstone, 140 Mont. 538, 374 P.2d 328.

On the other hand, the respondents, Garden Spot and Gordons urge the rule laid down in State v. Gateway Mortuaries, Inc., 87 Mont. 225, 243, 287 P. 156, 160, 68 A.L.R. 1512, as follows:

"* * * The argument that 'it is only when no state of circumstances could exist to justify the exercise of the police power that the law will be declared void,' supposed to be the

doctrine of some cases, *manifestly is unsound,* for abuses may be found in every business; and that doctrine carried to its legitimate conclusion would remove all restraints and permit paternalistic and arbitrary legislation without end, wiping out constitutional guarantees under the guise of an undefined power 'outside and in a sense above the Constitution. Donnelly v. Decker, 58 Wis. 461, 17 N.W. 389, 46 Am.Rep. 637.' State v. Redmon, [134 Wis. 89, 114 N.W. 137, 14 L.R.A.,N.S., 229], supra.

" 'Our government was not designed to be paternal in form.' Ex parte Jentzsch, [112 Cal. 468, 44 P. 803, 32 L.R.A. 664], supra. As this court said, in Gas Products Co. v. Rankin [63 Mont. 372, 207 P. 993, 24 A.L.R. 294] supra, the paternal theory of government is odious, and we should not treat lightly or disregard the sacred rights recognized and guaranteed by the Constitution. Were we to sustain the constitutionality of this act, there would be no limit to which the Legislature might not go in depriving persons of the right to contract in a lawful way concerning a lawful business.''

This is particularly applicable where no legislative findings are made. It is true that the evidence must overcome the presumption of constitutionality beyond a reasonable doubt, but if it does, this court will not hesitate to declare it violative of the fundamental law if shown clearly and palpably. (State v. Gleason, 128 Mont. 485, 277 P.2d 530.)

In considering an appeal in an equity action, it is the duty of this court to review all questions of fact arising upon the evidence presented from the record. R.C.M.1947, § 93-216. In such a review this court indulges in the presumption that the findings of the trial court are correct. Kommers v. Palagi, 111 Mont. 293, 108 P.2d 208, and that such findings of fact will not be overturned unless there is a preponderance of the evidence against them. Copper Mountain Mining & Smelting Co. v. Butte & Corbin Consol. Copper & Silver Mining Co., 39 Mont. 487, 104 P. 540 (1909).

In Finlen v. Heinze, 32 Mont. 354, 380, 80 P. 918, 924 (1905), we stated that "it is incumbent upon the appellant to show that the preponderance of the evidence is against the findings of the trial court, before we will disturb such findings upon the ground of insufficiency of the evidence."

This rule has been repeated in many cases, the last being Duval v. Fuchs, 141 Mont. 123, 375 P.2d 541, wherein we recognized that the rule with respect to reversing a finding of fact by the district court in an equity action is that this court indulges in the presumption that the judgment of the trial court is correct, and will draw every legitimate inference therefrom to support the presumption (See Havre Irrigation Co. v. Majerus, 132 Mont. 410, 318 P.2d 1076.), and that our inquiry into the evidence is limited as to whether the findings of the trial court are supportable when the evidence is viewed in the light most favorable to the prevailing party. (See In re Rudd's Estate, 140 Mont. 170, 369 P.2d 526.)

█ As is apparent from the conclusions of law, the district court held the Act unconstitutional on all but one of the grounds presented. On this appeal, the parties combined seek a determination upon each and every ground presented in what we have heretofore described as a "broadside". This, they urge, would guide them, the public, and, perhaps, the Legislature in determining the course of future action. While such determinations may be desirable and of great interest, yet, we feel an extended discussion of all of the issues presented would muddle rather than clear our rules of statutory construction in the field of constitutional law. Thus, the scope of our inquiry will be limited to a determination of whether or not the Act in question is unconstitutional upon any of the grounds presented.

It is contended by appellants that the court erred in concluding as a matter of law that the Act deprives the plaintiffs and others, of liberty or property without due process

or equal protection of the law in violation of sections 3 and 27, Article III, Constitution of Montana.

Section 3, Article III, provides:

"All persons are born equally free, and have certain natural, essential, and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties, of acquiring, possessing, and protecting property, and of seeking and obtaining their safety and happiness in all lawful ways."

Section 27, Article III, provides:

"No person shall be deprived of life, liberty, or property without due process of law."

■ Without defining the police power, suffice it to say, that the above-quoted sections of Article III, are, among others, constitutional inhibitions upon the police power of the State of Montana. Iverson v. Dilno, 44 Mont. 270, 119 P. 719; Gas Products Co. v. Rankin, 63 Mont. 372, 207 P. 993; Brackman v. Kruse, 122 Mont. 91, 199 P.2d 971; State v. Gleason, 128 Mont. 485, 277 P.2d 530. This is illustrated by State v. Rathbone, 110 Mont. 225, 241, 100 P.2d 86, wherein this court in discussing the right to defend property as guaranteed by Section 3, Article III of the Montana Constitution, had this to say:

"It is conceded that the construction to be given a right guaranteed to the individual by the Constitution must always be a reasonable one. The result of the operation of the police power is necessarily in most instances an infringement of private rights, but in the exercise of such power, property and individual rights may be injured or impaired only to the extent reasonably necessary to preserve the public welfare."

The district court found that the effect of the license tax provided for in the Act will be to prohibit the use of trading stamps or other redeemable devices by plaintiff and Gordons, and that the same will be true of other retail merchants similarly situated in the State of Montana.

As previously quoted in full, the trial court found that the use of stamps and devices is a legitimate method of advertising and is common to the conduct of legitimate business enterprises.

The Act purports to grant to merchants in the State the right to engage in the use of stamps and devices upon the payment of the license tax, without requiring the performance of any further conditions, and that the Act, therefore, is a revenue, not a regulatory measure.

If, as defendants contend, the Act is a regulatory measure, it is most unusual in that regard, for, other than the requirement of a license fee, the only other semblance of regulation set forth therein is that the Board may require the applicant for a license to state in his application such facts as the Board may deem necessary to enable it to pass upon the application. But, whether enacted under the guise of a regulation or whether made for the purpose of raising revenue, if the effect of a statute is to indirectly prohibit a legitimate business, so far as the police power is concerned, such a statute must be considered in the same light as a statute containing a direct prohibition. Brackman v. Kruse, supra.

Here, the Legislature by purporting to license, has declared the use of trading stamps and devices as legitimate. Here, the Act, as related above, is not a regulatory measure even in form. In form, other than the title, it is a tax but in fact, under the evidence in this case, the fee or tax imposed is so high that it constitutes an effective prohibition of the issuance of all redeemable devices governed by it.

Witnesses for Garden Spot and Gordons both testified that it would be impossible for them to continue issuing redeemable devices governed by the Act, if the tax imposed were payable by them. On the basis of this testimony the trial court found that amount of the tax was prohibitory.

The court further found that there was no relationship between the amount of tax and the cost of administration, and

that the disparity was such as to demonstrate the prohibitory character of the Act.

It must also be borne in mind that the penalty provision of the Act, contained in Section 8, provides that any person subject to the license fee who fails to pay it, or any part thereof, when due, shall be liable for three times the amount of the fee which is due.

In this regard, the trial court found in part:

"The Act in question provides in part that any retail merchant who engages in any of the practices described in the Act without having first paid the license tax therein provided, or any part thereof when due, shall be mandatorily liable for three times the amount of the unpaid or delinquent tax; because of the ambiguities contained in the Act, it is difficult, if not impossible, for men of common intelligence and understanding to determine what activities may be engaged in by retail merchants within the State, without their first having obtained the license, provided for under the terms of the act."

While we do not bottom this opinion on whether the Act is ambiguous or misleading, or unreasonably discriminatory, or whether the penalty is excessive, yet those factors, taken collectively demonstrate that the Act clearly and palpably prohibit a legitimate business enterprise, as so declared by the Legislature.

■ Under sections 3 and 27 of Article III, quoted previously, legitimate business enterprise is protected against this very type of legislation. This court in Brackman v. Kruse, supra, 122 Mont. 91, 112, 199 P.2d 971, pointed out that under either theory the Legislature cannot, directly or indirectly, prohibit a legitimate business or occupation and stated:

"In 37 C.J., § 37, page 187, it is said: 'But where a license or a license tax is imposed under the police power as a means of regulation, it must not be imposed upon such terms and conditions as to operate as the virtual prohibition of a use-

ful and legitimate occupation and business; and this rule has been held to apply, regardless of whether the license tax is levied under the police or the taxing powers.' "

In that same case, Brackman v. Kruse, supra, a tax levied on the sale of oleomargarine was declared unconstitutional, and again quoting from Corpus Juris, the court said:

" 'Unless the occupation or business is of a nature which is injurious or offensive to the public welfare, see C.J.S. title Licenses § 19, also 37 C.J. p. 193 note 54, the imposition of a license tax contravenes the constitutional guarantees of person and property where the tax is so unreasonable or arbitrary as to amount to a confiscation of property or a denial of the right to engage in a particular trade, occupation, or profession, particularly when it is levied pursuant to the police power of the state.' "

In declaring the Photographic Examiners Act unconstitutional as a denial of due process, this court in State v. Gleason, supra, 128 Mont. 485, 488, 277 P.2d 530, held:

"If we are to assume that a distinction in the cases exists, nonetheless, before the legislature can invoke the police power of the state there must be fair reason for the law that would not require with equal force its extension to others whom it leaves untouched. State v. Safeway Stores, Inc., 106 Mont. 182, 76 P.2d 81. Unless there is something in the nature of the occupation which calls for the exercise of the police power of the states, its purported use by the legislature is without constitutional favor."

In applying the constitutional provisions above-cited, this court has laid down the fundamental rule that any act, purportedly passed under the police power of the state, must be reasonable and must not be arbitrary or discriminatory.

In State v. Gateway Mortuaries, Inc., supra, 87 Mont. 225, 239, 287 P. 156, 159, this court said: "The police power of the state extends only to such measures as are reasonable, and

the general rule is that all police regulations must be reasonable under all circumstances."

In the case of State v. Gleason, supra, 128 Mont. 485, 488, 277 P.2d 530, it was said:

" 'This case [Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469] does not announce the rule that a state legislature may pass any kind of regulatory law for any kind of business or occupation under the police power but, on the contrary, conditions the exercise of such power with the limitation that it must not be arbitrary or discriminatory.' Buehman v. Bechtel, 57 Ariz. 363, 114 P.2d 227, 231, 134 A.L.R. 1374." See also Montana Milk Control Board v. Rehberg, 141 Mont. 149, 376 P.2d 508.

Our inquiry then is whether the use of redeemable devices to promote retail sales is a legitimate and useful business activity, or whether it is a practice which, in the interest of the general welfare of all the inhabitants of this state, could be condemned by the Legislature. Of course, we reiterate that in this most unusual piece of legislation the Legislature, by licensing, has seemingly declared it legitimate and useful, but by taxing as it did, condemns it.

The question has been before courts all over the United States; we must answer it under our own Constitutional provisions. The trend in our decisions shows that attempts to restrict freedom of enterprise have been stricken down. We seem to be aligned with most courts in the nation. While we do not intend to exhaustively review other jurisdictions, among the cases striking down such statutes as being beyond the police power are the following, all decided before 1916: Ex parte Drexel, 147 Cal. 763, 82 P. 429, 2 L.R.A.,N.S., 588 (1905); Ex parte West, 147 Cal. 774, 82 P. 434 (1905); Denver v. Frueauff, 39 Colo. 20, 88 P. 389, 7 L.R.A.,N.S., 1131 (1906); Sperry & Hutchinson Co. v. City of Owensboro, 151 Ky. 389, 151 S.W. 932 (1912); O'Keefe v. City of Somerville, 190 Mass. 110, 76 N.E. 457 (1906); In re Opinion of the Jus-

tices, 208 Mass. 607, 94 N.E. 848 (1911); State ex rel. Harti-gan v. Sperry & Hutchinson Co., 94 Neb. 785, 144 N.W. 795, 49 L.R.A.,N.S., 1123 (1913); State ex rel. Simpson v. Sperry & Hutchinson Co., 110 Minn. 378, 126 N.W. 120, 30 L.R.A., N.S., 966 (1910); State v. Ramseyer, 73 N.H. 31, 58 A. 958 (1904); People ex rel. Madden v. Dycker, 72 App.Div. 308, 76 N.Y.S. 111 (1902); People ex rel. Appel v. Zimmerman, 102 App.Div. 103, N.Y.S. 497 (1905); People v. Gillson, 109 N.Y. 389, 17 N.E. 343 (1888); State v. Dalton, 22 R.I. 77, 46 A. 234, 48 L.R.A. 775 (1900); State v. Dodge, 76 Vt. 197, 56 A. 983 (1904); Young v. Commonwealth, 101 Va. 853, 45 S.E. 327 (1903).

In 1916, there were three cases decided by the Supreme Court of the United States, Rast v. Van Deman & Lewis Co., 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679; Tanner v. Little, 240 U.S. 369, 36 S.Ct. 379, 60 L.Ed. 691; and Pitney v. Washington, 240 U.S. 387, 36 S.Ct. 385, 60 L.Ed. 703, which held that all devices redeemable in merchandise could be prohibited without violating the Fourteenth Amendment to the Federal Constitution. In addition, there are five decisions in three states which follow these Supreme Court decisions. These five, all rendered within three years of the Supreme Court decisions, will be found in State v. Wilson, 101 Kan. 789, 168 P. 679, L.R.A. 1918B, 374 (1917); State v. Crosby Bros. Mer-cantile Co., 103 Kan. 733, 176 P. 321 (1918); In re Trading Stamp Cases, 166 Wis. 613, 166 N.W. 54 (1917); Sperry & Hutchinson Co. v. Weigle, 169 Wis. 562, 173 N.W. 315 (1919); and State v. J. M. Seney Co., 134 Md. 437, 107 A. 189 (1919).

The majority of State courts have refused to follow the 1916 Supreme Court cases, and have held that the prohibition of redeemable devices is beyond the police power of the state, and hence, unconstitutional and void. In fact, with the ex-ception of Steffey v. City of Casper (Wyo.1961), 357 P.2d 456, no case has been decided since 1919 which has upheld the constitutionality of such legislation. Moreover, all of the cases

upholding the constitutionality of laws prohibiting redeemable devices are distinguishable from the case at bar in that none of them went as far as the Act under review. None of them prohibited devices redeemable in cash. In the Rast case, supra, the United States Supreme Court specifically said that it expressed no opinion as to the constitutionality of a statute prohibiting devices redeemable by cash, discounts, credit, etc. (240 U.S. 342, 36 S.Ct. 370). The same is true of the Tanner case, supra, 240 U.S. 369, 36 S.Ct. 379, and by reference, the Pitney case, supra, 240 U.S. 387, 36 S.Ct. 385. No case approves a statute prohibiting redeemable devices *per se*. Trading stamps redeemable in cash are still in use in Wyoming. Chapter 153 prohibits devices redeemable in merchandise, service *or cash*.

The following cases decided since 1919 have declared legislation prohibiting redeemable and like devices to be unconstitutional under state constitutions: Denver v. United Cigar Stores Co., 68 Colo. 363, 189 P. 848 (1920); United Cigar Stores Co. v. People, 68 Colo. 546, 190 P. 1117 (1920); Lawton v. Stewart Dry Goods Co., 197 Ky. 394, 247 S.W. 14, 26 A.L.R. 686 (1923); State v. Lothrops-Farnham Co., 84 N.H. 322, 150 A. 551 (1930); Sperry & Hutchinson Co. v. Kent Prosecuting Attorney, 287 Mich. 555, 283 N.W. 686 (1939); People v. Victor, 287 Mich. 506, 283 N.W. 666, 124 A.L.R. 316 (1939); Sperry & Hutchinson Co. v. Director of Division of Necessaries of Life, 307 Mass. 408, 30 N.E. 2d 269, 131 A.L.R. 1254 (1940); Alabama Independent Service Stations Ass'n v. McDowell, 242 Ala. 424, 6 So.2d 502 (1942).

Several of the cases striking down the prohibition of redeemable devices involved legislation which, like the Act in the case at bar, imposed prohibitive license taxes on the issuance of such devices. Ex parte McKenna, 126 Cal. 429, 58 P. 916 (1899); Sperry & Hutchinson Co. v. City of Owensboro, 151 Ky. 389, 151 S.W. 932 (1912); and State v. Lothrops-Farnham Co., 84 N.H. 322, 150 A. 551 (1930), are typical of this line of authority.

Turning now briefly to the Wyoming case, Steffey v. City of Casper, supra, both the Board and Abel rely heavily on that decision. They state that while the question in the Wyoming case was as to an actual outlawing, if the stamps may be outlawed, their use may be licensed. Having already disposed of this difference, we shall look briefly to the Wyoming case. There the court "assumed a state of facts" contrary to what we have heretofore shown as the law in Montana. There, too, the court found "coercion" by the stamp companies. We have no such evidence here and the trial court so found. Also the Wyoming Court dealt only with facts involving *trading stamps* and *trading stamp companies*. Our case involves, besides stamps, a multitude of non-stamp redeemable devices of the type employed and utilized by Gordons. There, too, the Wyoming statute did not prohibit the use of stamps redeemable with cash as would be the effect of ours.

We conclude that the Act in question was properly found to be unconstitutional as an unreasonable exercise of the police power as related to the object sought to be attained, that is, a prohibition of legitimate business practices.

We have not overlooked appellants' specification of error going to the receipt by the district court of exhibits and testimony concerning other promotional devices. Firstly, we cannot see where any prejudice resulted, and secondly, having rejected the theory of the consideration of the evidence advanced by appellants as not being the law of this state, such evidence was, for the most part, material to determining some or all of the issues framed by the pleadings.

We are aware that many other facets of the Act and of the record as discussed and argued in excellent briefs and arguments of the parties have not been answered. However, from what has been heretofore said, the judgment of the district court declaring Chapter 153, Montana Session Laws of 1961, to be unconstitutional, is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN CONWAY HARRISON, ADAIR and DOYLE, concur.